53 P.3d 504 (2002)
147 Wash.2d 213
WR ENTERPRISES, INC., Arthur W. Weatherford and Glennyce R. Rediger, Appellants,
v.
DEPARTMENT OF LABOR AND INDUSTRIES, Respondent.
No. 70377-9.
Supreme Court of Washington, En Banc.
Argued February 26, 2002.
Decided September 5, 2002.
Steve Berman, Erin Flory, Jon Schneidler, Seattle, for Appellants.
Christine Gregoire, Attorney General, Penny Allen, William Collins, Assistant Attorneys General, for Respondent.
MADSEN, J.
WR Enterprises (WRE) brought suit against the Department of Labor and Industries (Department) alleging four causes of action, two of which are the subject of this appeal. In the two relevant claims, WRE alleges (1) that the Department's method for setting premium rates for worker's compensation insurance exceeds its statutory authority under RCW 51.16.035 and decisions from this court, and (2) that the supplemental pension fund rate exceeds the statutory authority of RCW 51.32.073. The trial court granted summary judgment to the Department and WRE appeals that ruling. We affirm the trial court.

*505 FACTS
WRE is a Washington corporation engaged in the business of referring temporary housekeeping help to homeowners. A dispute arose between WRE and the Department regarding whether WRE was required to pay industrial insurance premiums for its housekeepers and the amount of any premiums owing. WRE filed this complaint for declaratory judgment, damages, and an injunction against the Department. Among other things, WRE sought an order from the trial court declaring that the Department's industrial rate-setting procedure violates RCW 51.16.035 and is contrary to this court's decisions in Washington State School Directors Association v. Department of Labor & Industries, 82 Wash.2d 367, 510 P.2d 818 (1973) and Pan Pacific Trading Corp. v. Department of Labor & Industries, 88 Wash.2d 347, 560 P.2d 1141 (1977). WRE also sought an order declaring that the flat rate premium that the Department charges as a supplement to the accident fund to provide supplemental pension payments exceeds the Department's authority under RCW 51.32.073.
WRE moved for summary judgment on these claims. The trial court heard argument and initially granted WRE's motion relating to the calculation of premiums paid to the accident and medical aid funds and denied its motion regarding the Department's calculation of premiums paid to the supplemental pension fund. Subsequent to this ruling the trial court also entered an order and findings of fact and conclusions of law.[1]
The Department moved for reconsideration and the court reversed its previous decision, holding that the Department had properly calculated accident and medical aid fund premiums. This appeal followed.

ANALYSIS
The benefits injured workers receive under the Industrial Insurance Act are paid from three state funds: the medical aid, accident, and supplemental pension funds.[2] The accident fund pays benefits to workers who were injured on the job or to the worker's family or dependents if the worker dies. Chapter 51.32 RCW. The medical aid fund covers medical treatment received by injured workers. RCW 51.04.030. The supplemental pension fund pays cost-of-living increases to workers with total and permanent disability and to the families or dependents of workers who have died. RCW 51.32.073, .075. The medical aid, accident, and supplemental pension funds are supported by the premiums collected from employers by the Department.
The parties have stipulated to the following facts respecting the history of premium rate-setting for the accident and medical aid fund:
(1) [T]he Department [of Labor and Industries] was formed in 1911 to administer the newly adopted industrial insurance [act] for the State of Washington.
(2) Under the terms of the [Act], all hazardous industries operating in the state were segregated into classes by industry with varying degree[s] of hazard.
(3) The Act provided compensation to workers injured on the job regardless of fault.
(4) A fund was established, the "accident fund", which was to fund these benefits.
(5) To provide the necessary revenue, a premium rate was established for each class which was paid by employers for their workers.
(6) Under the act the legislature directed that each class be self-sufficient and be required to meet the cost of all accidents occurring in that class.
(7) No class was to be liable for depletion of the accident fund for losses from accidents occurring in any other class.
(8) [T]he Department was directed to adjust the premium rate for each class as may be necessary from time to time to *506 allow the class to cover the costs of its accidents plus its share of the general expense of administration.
(9) In 1917 the Act was amended to include a medical aid fund which, like the accident fund, was funded by each separate independent class with premiums governed solely by the claims from that class.
. . . .
(12) However, during the past 20 years, the Department changed its rate-setting procedure and now sets premiums for both funds based upon the performance of all classifications statewide and not solely upon the performance of the individual classification or subclassification.
(13) This has resulted in some employers and classifications paying excess premiums to cover losses suffered by classifications other than their own.
(14) The Department believes that it received authority to make this change from RCW 51.16.035 adopted in 1971.
(15) The 1971 amendment expanded coverage of the Act to include nearly all industries including non-hazardous occupations.
Clerk's Papers (CP) at 334-35.
The first issue WRE raises is whether the current rate-setting formula for determining accident and medical aid fund insurance premiums violates the Industrial Insurance Act, specifically RCW 51.16.035, and decisions of this court interpreting that provision. RCW 51.16.035 governs the process by which the Department must set its premium rates.[3] The interpretation of this statute is a question of law. State v. Keller, 143 Wash.2d 267, 276, 19 P.3d 1030 (2001).
The portion of RCW 51.16.035 relevant to the first issue here provides:
(1) The department shall classify all occupations or industries in accordance with their degree of hazard and fix therefor basic rates of premium which shall be the lowest necessary to maintain actuarial solvency of the accident and medical aid funds in accordance with recognized insurance principles. The department shall formulate and adopt rules and regulations governing the method of premium calculation and collection and providing for a rating system consistent with recognized principles of workers' compensation insurance which shall be designed to stimulate and encourage accident prevention and to facilitate collection. The department may annually, or at such other times as it deems necessary to maintain solvency of the funds, readjust rates in accordance with the rating system to become effective on such dates as the department may designate.
RCW 51.16.035(1).
The formula currently applied by the Department has several steps.[4] First, the Department classifies all occupations or industries in accordance with their degree of hazard. Then, it evaluates the performance of both the medical aid and accident funds overall and determines if rates need to be adjusted to maintain the solvency of the fund. If rates need to be adjusted, the experience of each class is compared to that of the overall fund and the rates are adjusted accordingly. That is, if a particular class performed better than the fund as a whole (incurred fewer losses per hours worked), then that class's base rate would be lowered. Alternatively, if a particular class suffered more losses per hours worked in comparison to the overall fund, then its base rate would be raised. Such adjustments maintain solvency of the fund.
Once the base rates are set, the Department calculates the premium an employer pays for each classification by first adding the base rates for each classification for the accident and medical aid fund together. This number is multiplied by the employer's experience factor. The experience factor is calculated by comparing the past costs or losses *507 incurred by an employer to the expected losses within that classification. This amount is then added to the universal rate for the supplemental pension fund. Finally, the combination of the rates for the accident, medical aid and supplemental pension funds is multiplied by the number of reported worker hours in that classification. This is the amount an employer pays for workers' compensation insurance for each classification.[5]
In granting the Department's motion for summary judgment, the trial court concluded that the Department is permitted to set rates for the accident and medical aid fund taking into consideration the fund as a whole and that the Department is not required to establish premium rates so that each class is self sufficient, meets its own costs, and is not liable for depletion of the fund due to losses suffered by other classes. CP at 337.
As a threshold matter, it is uncontested that the Department's formula classifies occupations by risk and those classifications are used in determining the rates each class will pay. While the actual dispute may be over the extent to which the rates must reflect risk classification, the Department's method comports with at least the first requirement of RCW 51.16.035, that the Department must classify occupations according to degree of hazard.
WRE argues, however, that even if the premium rates do reflect employers' risk classifications to some degree, the statute requires much more than that the methodology "reflect" risk classification. WRE contends that the statute requires that the calculations be based entirely on risk classification so that each class is independent and self-sufficient and no class is liable for depletion of the fund for losses suffered by any other class. WRE is concerned primarily with the Department's practice of adjusting each class's accident and medical aid fund base rates based on a comparison of each class's experience to that of each fund as a whole. It argues that the Department should instead determine the adjustments needed to maintain solvency only by looking at each class individually.
WRE bases its argument on the history of the Industrial Insurance Act, contending that the very foundation of the Act is the requirement that no class of workers shall be liable for the depletion of the fund for accidents in any other class. This assertion, however, ignores the 1971 amendments to the Act, particularly RCW 51.16.035. It is true that when the Act was passed in 1911 the Legislature intended each class to be self sufficient. See Laws of 1911, ch. 74. Former RCW 51.16.020, which provided the method for premium rate-setting, made that clear.[6] However, the legislature repealed former RCW 51.16.020 in 1971 and enacted RCW 51.16.035 in its place. Significantly, the Legislature eliminated language in former RCW 51.16.020 providing that "no class shall be liable for the depletion of the accident fund for accidents happening in any other class." It also deleted language requiring self sufficiency. Further, RCW 51.16.035 eliminated the former requirement that the condition of "each such class or subclass account" be taken into consideration when determining the base rate. Former RCW 51.16.020. In short, none of the provisions requiring self sufficiency and independence between classes survived the 1971 amendments to the Act.
WRE devotes little attention to the fact that former RCW 51.16.020 was repealed *508 or to the language of the replacement legislation, RCW 51.16.035. Instead, WRE relies heavily on practices followed by the Department during the 70 years preceding the repeal of former RCW 51.16.020. In so doing, WRE apparently believes that the current intent of the Legislature may be found in a repealed statute. However, it is axiomatic that where one statute is repealed and another takes its place, the new statute supersedes as law. State v. Bell, 8 Wash.App. 670, 508 P.2d 1398 (1973). Further, when a material change is made in the wording of a statute, a change in legislative purpose must be presumed. Graffell v. Honeysuckle, 30 Wash.2d 390, 399, 191 P.2d 858 (1948). Thus, while WRE's challenge here depends upon a determination by this court that the Legislature intended that the Department continue to set rates based on class-based solvency, the repeal of RCW 51.16.020 and the language of RCW 51.16.035 do not support such a conclusion.
The Department argues that a 1972 amendment to former RCW 51.14.020 demonstrates that the Legislature intended to adopt a fund-based solvency approach when it adopted RCW 51.16.035. Specifically, the 1972 amendment to former RCW 51.14.020 substituted the words "state fund" for the words "employer's class account." While the 1972 amendment arguably supports the Department's position, we are convinced that the language of RCW 51.16.035 itself directs the Department to consider the solvency of the accident and medical aid funds when it sets rates for the various classifications.[7] For the first time, in its 1971 amendment the Legislature included the directive that the Department fix basic rates "which shall be the lowest necessary to maintain actuarial solvency of the accident and medical aid funds in accordance with recognized insurance principles." RCW 51.16.035. At the same time the Legislature repealed former RCW 51.16.020, eliminating class-based solvency language from the rate-setting scheme.
WRE contends though, that this court specifically held in Washington State School Directors Association v. Department of Labor & Industries, 82 Wash.2d 367, 510 P.2d 818 (1973), and Pan Pacific Trading Corp. v. Department of Labor & Industries, 88 Wash.2d 347, 560 P.2d 1141 (1977), that the 1971 amendment did not materially change the Act and that cross-class subsidies are absolutely barred by RCW 51.16.035.
In School Directors, 82 Wash.2d 367, 510 P.2d 818, plaintiffs sought to bar the Department's enforcement of the "new Act" (referring to the 1971 Amendments) against them. They raised numerous constitutional claims, among them, as stated by the court, was that the "basic purpose of the 1971 act is revenue raising and that the act requires them to contribute to an existing deficit in violation of many of their constitutional rights." Id. at 379, 510 P.2d 818. The precise claim by Plaintiffs in School Directors, which relates to the issue before us, was
[t]hat the 1971 Act is an improper attempt to exercise the State police power both because of the real purpose behind the legislation, i.e. revenue raising for others, and the unreasonable means used to accomplish its stated purpose which deprived Appellants of their liberty and property without due process of law and denied them the freedom to contract and impaired their existing contracts.
App. in Supp. of Appellants' Br. at 4 (App. 000040).
The court rejected the plaintiff's constitutional claims. In its analysis, the court did not discuss the implications of the amendments' language relating to solvency of the fund. Rather, the court addressed the narrow issue of whether the 1971 Amendments changed the requirement that rates be charged according to risk classification. The court found:

*509 The new statute merely requires that the department classify all occupations or industries in accordance with their degree of hazard and fix rates that shall be the lowest necessary in accordance with recognized insurance principles. Implicit within the very wording of RCW 51.16.035 is the concept of rates being charged according to the degree of hazard involved within the various classes. Recognized insurance principles require such a concept.
School Directors, 82 Wash.2d at 380, 510 P.2d 818.
WRE contends, however, that the issue of "cross-classification subsidy was squarely before the Supreme Court" in School Directors and that because the court did not accept the view that the 1971 amendments replaced the classification-based rate-setting scheme with a new one based on overall fund solvency and cross-classification subsidies, the court has clearly resolved the issue. Appellant's Br. at 12. WRE makes too much of School Directors. While it may be possible to read the court's decision as urged by WRE, it is equally plausible that the court in School Directors considered risk pooling to maintain fund solvency as one of the recognized insurance principles referred to by the 1971 Amendment. At most School Directors stands for a proposition that neither party disputes: RCW 51.16.035 requires the Department to classify occupations and industries according to risk and base rates on these classifications in accordance with recognized insurance principles. School Directors, 82 Wash.2d at 380, 510 P.2d 818.
WRE relies on a second case, Pan Pacific, to argue this court has explicitly banned cross-class subsidy. In Pan Pacific, this court considered a challenge to the Department's practice of classifying log storage activities in the same category with general logging activities. The testimony there showed that the two activities were markedly different and that general logging was substantially more dangerous than log storage. The issue was whether the two activities could be classified together and this court found that they could not. Pan Pac. Trading Corp., 88 Wash.2d 347, 560 P.2d 1141. WRE argues that the court held in Pan Pacific that "no employer shall be liable for losses arising in other classifications." Appellant's Br. at 19. The Department argues that the case is irrelevant because it does not pertain to calculating the base premium rate for the various classifications.
In Pan Pacific the court said "the legislature obviously intended an employer not be required to pay for a risk not present in its particular industry." Pan Pacific, 88 Wash.2d at 352, 560 P.2d 1141. The court's statement, however, was in answer to the question whether employers who operate log storage warehouses should pay the same exact insurance premiums as those who employ loggers in the field. See id. ("`logging is the most dangerous occupation in the world'"). Neither Pan Pacific nor School Directors provides guidance.[8]
Finally, WRE points to the Department's stipulation that it sets premiums based upon the performance of all classifications and that the practice has "resulted in some employers and classifications paying excess premiums to cover losses suffered by classifications other than their own" as conclusive evidence that the Department's rate-setting methods violate RCW 51.16.035. CP at 5. WRE takes this language out of context. The declaration of Dr. William Vasek more fully explains the stipulation.
The Department stipulated that some employers and classifications have paid excess premiums to cover the losses suffered by other employers and classifications. This "excess premium" occurs because the Department, like any insurance company, *510 cannot predict with 100% accuracy the actual covered losses sustained. Insurers charge guaranteed cost premiums to cover the losses expected from injuries occurring within the coverage period. Such prospective charging is the generally accepted insurance method.
. . . .
Some employers and classifications will have paid amounts in excess of what the costs will eventually be for the insurance coverage period. Other employers and classifications will have paid premiums less than the costs suffered during the insurance coverage period. However, in succeeding coverage periods, there will be reversals as the costs incurred will vary considerably from period to period depending on the size of the class.... This is the accepted and recognized insurance principle.
CP at 240-41 (Vasek Decl.).[9]
As this declaration highlights, RCW 51.16.035 directs that the Department's methodology adhere to recognized insurance principles and result in the lowest rates necessary to maintain actuarial solvency of the accident and medical aid funds. Under RCW 51.16.035, recognized insurance principles govern whether the Department may base its method for maintaining solvency on each of the funds or whether solvency must be determined class by class.
There are several accepted principles incorporated by the Department into its rate-setting method. See Vasek Decl., CP at 235-43. First is that insurance is prospective and does not recoup for past losses; therefore, the accident and medical aid funds must be prefunded. Prefunding means that premiums paid during a given year are intended to fully fund the expected costs for that year. Second, the funds must include a contingency reserve so that benefits will not be prematurely terminated or reduced because of future unanticipated losses. This contingency reserve ensures that the funds from which benefits are paid remain solvent. The third principle at issue in rate-setting is risk pooling. Risk pooling is the practice of pooling those with greater and lesser risks together to better account for and minimize the unpredictable risk for everyone. An aggregated pool of risks is much more predictable than the average risk within a given pool. The final principle embodied in the Department's method is risk classification. Essentially, rates must reflect risk and those with a higher risk should pay higher premiums.[10]
WRE does not dispute Vasek's declaration but points to a 1998 Workers' Compensation System Performance Audit, Preliminary Report that assessed the Department's rate-setting practices, arguing that it shows the Department's rate-setting method results in some employers and classifications paying excess premiums to cover losses suffered by classifications other than their own.[11]
*511 This audit does not support WRE's argument. Significantly, the audit concluded that the Department's overall rate making represents an acceptable actuarial approach. It does not criticize the Department for its fund-based approach to rate setting and does not recommend that cross-subsidy issues present in classification rate making be remedied by establishing separate accident and medical aid funds for each classification. Aside from the fact that the audit report is merely a preliminary report, and therefore of questionable value, we find nothing in the report to support WRE's contention that the Department's practice of considering over-all fund solvency when setting classification rates violates RCW 51.16.035 or accepted insurance principles.
We hold that the Department's practice of comparing each class's experience to each of the medical aid and accident funds once the occupations have been classified complies with RCW 51.16.035 and that the Department's method for setting premium rates for the medical aid and accident funds is consistent with recognized insurance principles.
The next issue WRE raises is whether the Department is precluded from charging a universal flat rate for supplemental pension fund insurance. WRE contends that, under the Industrial Insurance Act, the Department is required to set supplemental pension fund rates according to risk classification. The Department argues that the Act requires only that it set supplemental pension fund premiums at a rate "no more than necessary to make payments on a current basis" and therefore the universal flat rate is permissible under the Act. Br. of Resp't at 43.
The supplemental pension fund pays for cost of living increases and is collected from both the employer and employee under RCW 51.32.073, which provides, in part:
[E]ach employer shall retain from the earnings of each worker that amount as shall be fixed from time to time by the director, the basis for measuring said amount to be determined by the director. The money so retained shall be matched in an equal amount by each employer ... and shall be no more than necessary to make such payments on a current basis.
RCW 51.32.073(1).
WRE argues that chapter 51.16 RCW of the Industrial Insurance Act, governs assessments of premiums for all Industrial Insurance Act funds, including the supplemental pension fund, RCW 51.32.073(1). This argument is not persuasive. The supplemental pension fund is authorized, defined, and governed by chapter 51.32 RCW. If the Legislature had intended the supplemental pension fund to be calculated in the same manner and subject to the same rules as the medical aid *512 and accident funds, it could have put the provisions for the supplemental pension fund in the same section as the medical aid and accident funds. Instead, in 1971 the Legislature added RCW 51.16.035 and RCW 51.32.073 to the Act as separate and distinct provisions. WRE offers no authority for its argument that RCW 51.32.073 is governed by RCW 51.16.035. Further, it appears that the Legislature intended only to require that the payments be set at the lowest rate possible to maintain current payments. Although WRE cautions against the dangers of unfettered discretion in the hands of the Department, it does not show how the flat rate charged by the Department violates the mandate that the premiums must be the lowest necessary to make current payments. The statute governing supplemental pension fund premiums requires only that the premiums be the lowest necessary to make payments. The statutes do not require the Department to set payments for the supplemental pension fund according to risk classification and in accordance with recognized insurance principles as is required by RCW 51.16.035 for the accident and medical aid fund base rates.
WRE further argues that this court's holding in School Directors, 82 Wash.2d 367, 510 P.2d 818, prohibits charging all employers and employees the same base rate for the supplemental insurance fund. WRE contends this court specifically mandated that the Department adopt an assessment basis that correlates with the losses in each risk classification and that is in accordance with recognized insurance principles. This court's holding in School Directors, or the portion that WRE relies upon, considered RCW 51.16.035, not the statute at issue here, RCW 51.32.075. School Directors is inapplicable.
The Department persuasively points out the reasons that the supplemental pension fund is calculated differently than the accident and medical aid funds. First, the Department notes that while the accident and medical aid funds are prefunded to cover future losses, the supplemental pension fund covers cost of living increases for losses that are already being paid out. The Department argues that the supplemental pension fund, because it covers cost of living increases, "is not for something that would traditionally be thought of as insurance." CP at 135 (Vasek Decl.). The supplemental pension fund premiums are not based on risk while the medical aid and accident premiums are, and therefore the supplemental pension fund premiums do not need to be calculated in accordance with recognized insurance principles to manage the inherent risk.
We hold that the Department is not required to set the premiums for the supplemental pension fund according to risk classification.
The trial court is affirmed.
ALEXANDER, C.J., SMITH, JOHNSON, IRELAND, BRIDGE, CHAMBERS, OWENS, JJ., concur.
SANDERS, J., dissenting.
This dispute arose when WR Enterprises, Inc., learned the Department of Labor and Industries (L & I) levied industrial insurance premiums which were excessive and grossly disproportionate to the risk experienced in its class of industry.
The parties agree L & I's current rate-setting structure makes employers in comparatively low-risk industries pay disproportionately high premiums to cover losses incurred by higher-risk industries. Although such violates the statute as construed in prior decisions of this court, the majority nevertheless approves L & I's practice.
Washington State School Directors Association v. Department of Labor & Industries, 82 Wash.2d 367, 380, 510 P.2d 818 (1973) held 1971 amendments to the Industrial Insurance Act maintained the long-standing requirement that employers pay their own way, and not be forced to pay for risks not present in their own industry. In School Directors employers in low-risk industries challenged the 1971 amendments to the Industrial Insurance Act which extended coverage of the Act from only extrahazardous industries to virtually all industries. Id. at 370, 510 P.2d 818. Their concern was RCW 51.16.035 might be construed to allow L & I to impose disproportionate premiums on the newly included industries to subsidize losses suffered by more *513 hazardous employment classifications. Sch. Dirs. Ass'n, 82 Wash.2d at 379, 510 P.2d 818.
The plaintiffs argue that under the new act they are liable for the depletion of the accident fund for accidents happening in classes other than their own. In other words, their premiums must help to pay the costs of insurance for those in risk categories other than their own. They base this argument upon the repeal of RCW 51.16.020 and RCW 51.16.010 in 1971, and the enactment of RCW 51.16.035....
Sch. Dirs. Ass'n, 82 Wash.2d at 379, 510 P.2d 818. We noted the concern but held RCW 51.16.035 did not change the long-standing rule that each classification must bear its own losses and not be held liable for losses suffered by other classes.
Formerly, under RCW 51.16.020 and RCW 51.16.010, the department was directed that no class should be liable for the depletion of the accident fund for accidents happening in other classes. It was also directed that the industries should pay in proportion to the amount of expense they created as a result of injuries in their particular field. Those industries encountering high accident rates would pay more than those industries encountering lower accident rates. Thus, the rates were based on the amount of risk involved in the particular class, in accordance with recognized insurance principles. We detect no real change in the basic legislative scheme.

Sch. Dirs. Ass'n, 82 Wash.2d at 380, 510 P.2d 818 (emphasis added).
We further explained the amendment adhered to the recognized insurance principle that premium rates be charged according to risk.
The new statute merely requires that the department classify all occupations or industries in accordance with their degree of hazard and fix rates that shall be the lowest necessary in accordance with recognized insurance principles. Implicit within the very wording of RCW 51.16.035 is the concept of rates being charged according to the degree of hazard involved within the various classes. Recognized insurance principles require such a concept.

Id. (emphasis added).
A few years later we reiterated this rule in Pan Pacific Trading Corp. v. Department of Labor & Industries, 88 Wash.2d 347, 352, 560 P.2d 1141 (1977). There a company which merchandized raw logs challenged L & I's classification of its industry (log storage and sorting) together with the more hazardous industry of general logging activities. Id. at 348, 351-52, 560 P.2d 1141. We concluded L & I's practice was contrary to RCW 51.16.035 because it charged employers rates that did not properly relate to the "greatly dissimilar" degree of hazard in their respective industries, and while the legislature intended to grant L & I discretion to set appropriate rates, "[n]evertheless, the legislature obviously intended an employer not be required to pay for a risk not present in its particular industry." Pan Pac. Trading Corp., 88 Wash.2d at 352, 560 P.2d 1141 (emphasis added). We held where facts establish a rate established by L & I is not proportional to the risk associated with the class of employers, L & I abuses the limited discretion vested by RCW 51.16.035. See Pan Pac. Trading Corp., 88 Wash.2d at 352, 560 P.2d 1141.
Crown Zellerbach Corp. v. Department of Labor & Industries, 98 Wash.2d 102, 653 P.2d 626 (1982), again affirmed the same principle. Although the dispute there did not center on RCW 51.16.035, the operative principle was identical to that guiding our decisions in School Directors and Pan Pacific. Crown Zellerbach examined the approach taken by L & I to recover various costs incurred administering the state fund and self-insured claims. Crown Zellerbach Corp., 98 Wash.2d at 104, 653 P.2d 626. The Department recovered those costs via assessments against all employers, both self-insured and state fund participants. Id. But if a self-insured employer had claims remaining in the state fund for injuries that occurred before the employer became self-insured, the employer was required to pay for the administration of claims covered by the state fund. Id. at 105, 653 P.2d 626. Once these claims were satisfied, the self-insured paid only *514 those administrative costs related to self-insured claims. Id.
Crown Zellerbach became self-insured on July 1, 1975, and challenged L & I's assessment against it for state fund administrative costs incurred after that date. Id. at 104-06, 653 P.2d 626. We rejected this challenge, holding that "[e]ach self-insured employer must be responsible for the estimated total costs of administering its part of the Industrial Insurance Act." Id. at 107, 653 P.2d 626.
We have consistently held that statutes should receive a sensible construction to effect the legislative intent and, if possible, to avoid unjust or absurd consequences. The only sensible conclusion to draw regarding RCW 51.44.150 is that the Legislature did not intend to permit an employer to escape paying the administrative costs attributable to continuing State fund claims simply by becoming a self-insured employer. Adopting appellant's construction of the statute would lead to this incongruous result as well as an inequitable and unjust situation. If the costs of administering State fund claims of self-insurers are not a component of administrative costs to be assessed against self-insurers, then employers remaining in the State fund would be paying not only the costs of administering their claims but also those State fund claims of employers who have since become self-insured.

Id. (citation omitted). Cf. Dep't of Labor & Indus. v. Am. Adventures, Inc., 59 Wash. App. 790, 794, 801 P.2d 1032 (1990).
Thus, three times in the decade following the 1971 amendments we held L & I is prohibited by statute from charging employers rates or costs to recover losses or expenses incurred by classes other than their own. And here we have not only "considerable factual information," Pan Pac. Trading Corp., 88 Wash.2d at 352, 560 P.2d 1141, that rates charged to WRE are excessive in proportion to the risk inherent in its industry, but in point of fact, these parties stipulate L & I's rate structure "has resulted in some employers and classifications paying excess premiums to cover losses suffered by classifications other than their own." Clerk's Papers (CP) at 5.
The legislature has not amended RCW 51.16.035 to jeopardize the continued vitality of School Directors `construction of that statute. We presume the legislature is aware of judicial interpretations of its statutes. Glass v. Stahl Specialty Co., 97 Wash.2d 880, 887, 652 P.2d 948 (1982). Just as the legislature has found no reason to amend RCW 51.16.035, there is no reason for today's majority to judicially amend the statute by refusing to adhere to our precedent which construed it in School Directors and Pan Pacific.
Moreover the majority's results-oriented approach also ignores the legislature's own direction on how to construe RCW 51.16.035. The majority mistakenly relies on the legislature's repeal of former RCW 51.16.010 (1961) and RCW 51.16.020 (1961) and enactment of RCW 51.16.035 in their place to argue the legislative intent changed with the 1971 amendments. Majority at 507-508. According to the majority "it is axiomatic that where one statute is repealed and another takes its place, the new statute supersedes as law." Id. at 508 (citing State v. Bell, 8 Wash.App. 670, 508 P.2d 1398 (1973)).
Although that may be true in the most general sense, RCW 51.98.010 specifically provides we are bound to construe provisions of RCW Title 51 as "restatements and continuations" of repealed statutory provisions insofar as the new and the old statutes are "substantially the same,"[1] whereas in School Directors we found RCW 51.16.035 effected "no real change in the basic legislative scheme" that existed under the repealed provisions RCW 51.16.010 and RCW 51.16.020. Sch. Dirs. Ass'n, 82 Wash.2d at 380, 510 P.2d 818. The majority does not overrule School Directors, nor could it, since that decision has not been shown to be incorrect let alone harmful. In re Rights to Waters of Stranger *515 Creek, 77 Wash.2d 649, 653, 466 P.2d 508 (1970).[2] But it does not follow it.
L & I's current rate structure has precisely the failing prohibited by Title 51 RCW. Some employers, WRE among them, are charged higher rates to cover losses suffered in other classes. The parties stipulate:
11. Since 1911 the Department set premiums for [the accident fund and medical aid fund] so that each class would be self sufficient and that no class be liable for losses suffered by any other class.
12. However, the Department during the past 20 years changed its rate-setting procedure and now sets premiums for both funds based upon the performance of all classifications statewide and not solely the performance of the individual classification or subclassification.
13. This has resulted in some employers and classifications paying excess premiums to cover losses suffered by classifications other than their own.
CP at 5 (emphasis added).
The trial court's analysis highlighted this stipulation when it initially granted WRE's motion for partial summary judgment:
Implicit within the very wording of the statute under review in School Directors, then, is the concept that rates charged be according to the degree of hazard involved solely within each specific class. The stipulation of fact says that the Department has changed and revised its rate-setting procedures and set the premiums for both the accident fund and the medical aid fund based upon performance of all classifications statewide and not solely on the individual classifications or subclassifications, and, thus, some employers and classifications pay premiums in excess of what is necessary in order to cover losses suffered by classifications other than their own.
I conclude that that process as described and stipulated to by the Labor and Industries in the stipulation does not comply with School Directors, and, accordingly, on summary judgment, I would conclude as a matter of law that a rate-setting procedure as described by Labor and Industries that results in some employers and classifications paying excess premiums to cover losses suffered by other classifications does not meet the requirement of the statute as construed by the Supreme Court in School Directors.

Verbatim Report of Proceedings (Feb. 18, 2000) at 3-4 (emphasis removed).
Although the trial court ultimately reconsidered, for the reasons stated I would hold it was right the first time when it granted WRE's motion for partial summary judgment. L & I's rate structure exceeds its statutory authority under RCW 51.16.035 because *516 the rates imposed do not properly reflect the employers' actual risk.
I therefore dissent.
NOTES
[1] It appears that the trial court entered findings of fact because the parties had stipulated to all the material facts in the case and its findings reflect that stipulation.
[2] There is also a provision for employers who wish to self-insure but that provision is not at issue in this appeal. See Chapter 51.14 RCW.
[3] The supplemental pension fund is calculated differently than the medical aid or accident fund and will be discussed later in this opinion.
[4] Although WRE challenges the validity of the Department's rate-setting method, it does not dedicate any portion of its briefing to the actual calculation, method, or procedure by which the rates are set. Therefore, we rely on the Department's description of its formula.
[5] [[{Accident Fund Base Rate + Medical Aid Base Rate} × Employer's experience rating factor] + supplemental pension rate] × Exposure ( [exposure is] Usually the Number of Reported Hours in that class) = Premium owed in that class. Clerk's Papers at 235-43 (Decl. of Dr. William Vasek). CP at 130.
[6] The amounts to be paid into the accident fund shall be determined as follows: The department shall ... determine for each class and subclass, a basic premium rate for the ensuing calendar year and, in so doing, shall take into consideration: First, that no class shall be liable for the depletion of the accident fund for accidents happening in any other class; second, that each class shall meet and be liable for its own accidents; third, the cost experience of each class and subclass over the two year period immediately preceding July 1st of the year in which the basic rate is being fixed; fourth, the then condition of each class and subclass account.

Former RCW 51.16.020, repealed by Laws of 1971, 1st Ex.Sess., ch. 289, § 89.
[7] WRE points out that the plaintiffs in Washington State School Directors Association v. Department of Labor & Industries, 82 Wash.2d 367, 510 P.2d 818 (1973) argued the 1972 amendment to former RCW 51.14.020 clarifies that the Legislature intended to require employers to contribute to a deficit in the accident fund incurred by others outside the class and that the court rejected the argument. App. in Supp. of Appellants' Br. at App. 000056. But, as will be discussed, the School Directors court did not address whether RCW 51.16.035 requires the Department to consider solvency of the fund as a whole when setting rates for individual classes.
[8] WRE, while conceding the cases are not on point, offers two more appellate decisions in support of its contention that cross-class subsidies are prohibited by the Act, Crown Zellerbach Corp. v. Dep't of Labor & Indus., 98 Wash.2d 102, 653 P.2d 626 (1982) and Dep't of Labor & Indus. v. Am. Adventures, Inc., 59 Wash.App. 790, 801 P.2d 1032 (1990). These cases each deal with the collection of administrative costs pursuant to RCW 51.44.150 and are therefore inapposite to the issue at hand. This distinction is paramount because RCW 51.44.150, unlike RCW 51.16.035, does not require that rates be set in accordance with recognized insurance principles. As will be discussed infra, those principles govern the setting of rates in accordance with managing the risk inherent in accident insurancerisk that is just not present in administrative costs.
[9] WRE characterizes the Department's practice as a cross-class subsidy in part because the Department stipulated that the practice results in some classes paying excess premiums to cover losses suffered by classifications other than their own. However, the Department disputes this cross-class subsidy characterization. In the Vasek Declaration, the Department explains that the term "cross-subsidization" is incorrect when discussing "excess premiums." The Declaration states, "Cross-subsidization refers to intentionally adjusting premium rates at the time they are set. The Department does not and has not intentionally set premium rates below or above the anticipated risk." CP at 240 n. 2 (Vasek Decl.).
[10] See, e.g., H. Miriam Farber, Note, Subterfuge: Do Coverage Limitations and Exclusions in Employer-Provided Health Care Plans Violate the Americans With Disabilities Act?, 69 N.Y.U. L.Rev. 850, 866-868 (1994) (risk classification is an actuarial technique for estimating an individual's future claims costs based on risk characteristics that have either a direct or causal link or statistical link to the specific risk being measured... risk classification is the backbone of individual and group insurance underwriting....). Each of the principles set forth by the parties accords with industry standards for actuarial principles of insurance. See, e.g., Thomas Rynard, The Local Government as Insured or Insurer: Some New Risk Management Alternatives, 20 Urb. Law. 103, 108 (1988).
[11] According to the Executive Summary, the Joint Legislative Audit and Review Committee commissioned the audit to answer the following questions:

How do L & I's case reserving practices and methodologies impact rates, and how do they compare with other states and industry standards? In comparison to other states and to insurance industry standards, how well does L & I address the impact of rate volatility on different classes of employers, and at the same time ensure that rates are adequately related to claims experience? Are rates equitable across all class codes? Is there appropriate stakeholder involvement in the rate-setting process?
CP at 80.
The main focus, as explained in the Executive Summary, was to "examine the practices, methodology, assumptions, and criteria used in rate setting for the state fund." Id.
There were essentially three concerns identified in the report. First, [w]hile the overall rate making adopted by L & I's actuaries may be an acceptable actuarial approach we cannot, with confidence, say the same with regard to their classification rate making. The main reason for this is their treatment of serious vs. non-serious claims. It appears, based on conversation with Dr. William Vasek at L & I, that expediency and past practices dictate their giving equal weight to serious and non-serious claims.
CP at 83.
Second, the report expressed concern that the distribution of the 1998 rate reduction accrued to the benefit of future policyholders "when, in fact, this surplus cushion was built by past policyholders." CP at 81. Third, the report found two cross-subsidy issues created by retrospective rating refunds.
The report recommended that the Department evaluate loss development factors for serious and nonserious cases; that it construct a formula to provide returns in proportion to each employers' contribution to the excess reserve (adjust the Accident Fund and Medical Aid Rates by an equal percentage); and that the Department eliminate the retrospective premium return adjustment in rate making.
In response to the recommendations the Department commissioned the Milliman & Robertson firm to investigate the selection method for the separation point between serious and non-serious injury utilized by the Department. The firm concluded that the Department's method "conforms with sound actuarial standards and principles." CP at 172 (Decl. of Glenn J. Pruiksma).
[1] RCW 51.98.010 admittedly applies only to provisions repealed by Laws of 1961, ch. 23, whereas the amendment here at issue was adopted in 1971. Nevertheless the language demonstrates a legislative preference for continuity.
[2] Former RCW 51.16.010 (1961) set out the general provisions for how the accident and medical aid were to be funded:

51.16.010 Enabling provision for establishing premium ratesQuarterly payments. Inasmuch as industry should bear the greater portion of the cost of its accidents and occupational diseases and furnish medical, surgical and hospital care and treatment to its injured workmen in the proportion in which it produces injury and creates expense, each employer shall ... pay into the state treasury (1) for the accident fund and (2) for the medical aid fund, a certain number of cents for each man hour worked by the workmen in his employ, engaged in extrahazardous employment; if, however, there should be a deficit in any class or subclass, the director, through the supervisor of industrial insurance, shall assess the same against all the contributors to such class or subclass during the calendar year or fraction thereof in which said deficit was incurred or created ....
(Emphasis added.) Former RCW 51.16.020 (1961) then set out more specifically the process by which L & I was to determine the premiums for the accident fund:
51.16.020 Basis for determining accident fund premiumsCost experience. The amounts to be paid into the accident fund shall be determined as follows: The department shall, prior to the first day of January of each year, determine for each class and subclass, a basic premium rate for the ensuing calendar year and, in so doing, shall take into consideration: First, that no class shall be liable for the depletion of the accident fund for accidents happening in any other class; second, that each class shall meet and be liable for its own accidents; third, the cost experience of each class and subclass over the two year period immediately preceding July 1st of the year in which the basic rate is being fixed; fourth, the then condition of each class and subclass account.
(Emphasis added.)