IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| DEPARTMENT OF LABOR AND INDUSTRIES OF THE STATE OF WASHINGTON, | ) ) ) ) | No. 33094-0-III (consolidated with No. 33143-1-III) |
| Respondent, | ) ) | |
| v. | ) ) | PUBLISHED OPINION |
| BLANCA ORTIZ & UNIVERSAL FROZEN FOODS, | ) ) ) | |
| Appellant. | ) ) | |

KORSMO, J. — Blanca Ortiz and Universal Frozen Foods (UFF) appeal from an

order finding that benefits were overpaid as the result of a retroactive pension benefit, but

not requiring the Department of Labor & Industries (DLI) to repay the sum it overpaid

Ms. Ortiz. Concluding that the statutes authorize the action and DLI caused the loss in

question because it should have known that Ms. Ortiz already had received time loss

benefits, we reverse.

PROCEDURAL HISTORY

Ms. Ortiz slipped and injured herself while working for UFF during the late 1980s.

UFF, a self-insured employer, paid time loss compensation directly to Ms. Ortiz due to

of Industrial Insurance Appeals (BIIA). Although aware of the appeal, DLI did not participate in accordance with its usual practice involving self-insured employers.

Ms. Ortiz and UFF entered into a settlement agreement that retroactively placed Ms. Ortiz on the pension rolls effective October 1, 2002. The BIIA approved the agreement and accepted the retroactive pension. The agreement and BIIA order also required DLI to consider second injury fund relief. DLI subsequently agreed to that request. One effect of that decision was that DLI would pay the pension benefits from the second injury fund, while UFF would have to pay DLI the $13,500 cost of a permanent partial disability resulting from the injury. Another effect of the retroactive pension meant that UFF had overpaid Ms. Ortiz $237,149.28 in time loss benefits.

Upon determining that the second injury fund would apply, DLI issued Ms. Ortiz a check for $149,066.27 representing the pension benefits owed back to 2002.[1] UFF then sought repayment from DLI of the overpaid time loss benefits. DLI denied the request on the basis that repayment should have been included in the BIIA order.

UFF and Ms. Ortiz appealed to the BIIA. An industrial appeals judge wrote a proposed decision and order reversing the DLI overpayment decision and requiring DLI to make full repayment for UFF's time loss payments. The BIIA denied review of the

---

[1] Our record does not explain the discrepancy between the amount paid to Ms. Ortiz and the amount paid to UFF, but the figure is not in controversy in this appeal.

2

ruling, thereby adopting the proposed decision and order as its own. DLI paid UFF the $237,149.28 and appealed to superior court.

There DLI argued that although its typical practice was to send retroactive payments to the employer, it did not do so in this case because it did not know about the time loss payments. Ms. Ortiz advised the court that she was not able to return the $147,000 because it had been spent. The superior court ruled that UFF was in a better position than DLI to discover any overpayment caused by the settlement agreement and should be the party attempting to collect it. It ordered UFF to return the payment it had received from DLI.

UFF and Ms. Ortiz then appealed to this court. A panel considered the matter without argument.

## ANALYSIS

The ultimate question presented is who bears the burden of seeking repayment from Ms. Ortiz. Citing conflicting statutes, the parties each contend that the legislature has assigned the task to the opposing side. Their arguments require some review of the relevant statutes.

First, we note the well settled standards that govern review of this appeal. The construction of a statute is a question of law reviewed de novo. *Dep't of Labor & Indus. v. Granger*, 159 Wn.2d 752, 757, 153 P.3d 839 (2007); *Stuckey v. Dep't of Labor & Indus.*, 129 Wn.2d 289, 295, 916 P.2d 399 (1996). The court's fundamental objective in interpreting a statute is to ascertain and carry out the legislature's intent. *Arborwood*

3

*Idaho, LLC v. City of Kennewick*, 151 Wn.2d 359, 367, 89 P.3d 217 (2004). If the statute's meaning is plain on its face, the court must give effect to that plain meaning as an expression of legislative intent. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). Only if a statute remains ambiguous after a plain meaning analysis may the court resort to external sources or interpretive aids, such as canons of construction, case law, or legislative history. *Jongeward v. BNSF Ry. Co.*, 174 Wn.2d 586, 600, 278 P.3d 157 (2012); *State ex rel. Citizens Against Tolls (CAT) v. Murphy*, 151 Wn.2d 226, 242-43, 88 P.3d 375 (2004).

The Industrial Insurance Act (IIA) must be "liberally construed for the purpose of reducing to a minimum the suffering and economic loss arising from injuries and/or death occurring in the course of employment." RCW 51.12.010. Accordingly, "where reasonable minds can differ over what Title 51 RCW provisions mean, in keeping with the legislation's fundamental purpose, the benefit of the doubt belongs to the injured worker." *Cockle v. Dep't of Labor & Indus.*, 142 Wn.2d 801, 811, 16 P.3d 583 (2001). However, "a statutory directive to give a statute a liberal construction does not require us to do so if doing so would result in a strained or unrealistic interpretation of the statutory language." *Senate Republican Campaign Comm'n v. Pub. Disclosure Comm'n of State of Wash.*, 133 Wn.2d 229, 243, 943 P.2d 1358 (1997).

The IIA provides various benefits to injured workers depending on the particular circumstances of each case and is the exclusive remedy for workers who are injured during

the course of their employment. *Wash. Ins. Guar. Ass'n v. Dep't of Labor & Indus.*, 122 Wn.2d 527, 530, 859 P.2d 592 (1993); RCW 51.04.010. When a worker suffers an injury at work, the injury may prevent him from working for a period of time, prevent him from ever working again, or temporarily prevent him from all work and permanently prevent him from some work. The first situation represents a temporary total disability for which the worker can receive "time loss" compensation. *Franks v. Dep't of Labor & Indus.*, 35 Wn.2d 763, 766, 215 P.2d 416 (1950). The expectation in cases of temporary total disability is that the worker will make a full recovery. *Id.* The second *Franks* scenario represents a case of permanent total disability where the worker is never expected to recover and for which the worker receives pension benefits. *See Boeing Co. v. Doss*, 183 Wn.2d 54, 58, 347 P.3d 1083 (2015). Pension benefits represent a percentage of the worker's wage prior to the injury. *Id.*; RCW 51.32.060(1). The final situation involves a temporary total disability subsequently followed by a permanent partial disability. *Franks*, 35 Wn.2d at 766-67. There, the worker makes some recovery but not a complete recovery; at the point where an injury reaches a "fixed state," the worker transitions from a temporary total disability to a permanent partial disability. *Id.*; *see also Wilson v. Dep't of Labor & Indus.*, 6 Wn. App. 902, 496 P.2d 551 (1972); RCW 51.32.055(1).

An injured worker or her family will receive a variety of benefits upon an injury or accident. The two most common benefits are wage replacement for lost work and medical expenses. *Doss*, 183 Wn.2d at 60; *WR Enter., Inc. v. Dep't of Labor & Indus.*, 147 Wn.2d

213, 217, 53 P.3d 504 (2002). As noted above, wage replacement can come in the form of time loss compensation (temporary disability) or a pension (permanent disability). The injured worker may also recover medical expenses, but only while suffering a temporary disability; once the worker transitions from a temporary total disability to a permanent partial disability, medical benefits normally are no longer available. *See* RCW 51.36.010(4) (excepting situations where further treatment is deemed necessary for a "more complete recovery"). Another type of benefit that constitutes neither wage replacement nor medical costs comes when a worker suffers a permanent partial disability. *See Doss*, 183 Wn.2d at 60. For a permanent partial disability, the worker merely receives an award for the "loss of bodily function." *Id.*; *see also* RCW 51.32.080. This award will be the same regardless of who suffered the disability. *Fochtman v. Dep't of Labor & Indus.*, 7 Wn. App. 286, 294, 499 P.2d 255 (1972).

When an employer insures through the state fund, DLI pays benefits directly to workers—disability benefits through the accident fund, medical benefits through the medical aid fund, and pension benefits through the pension reserve fund. *Doss*, 183 Wn.2d at 58; *WR Enters.*, 147 Wn.2d at 216-17; RCW 51.44.070. Self-insured employers, on the other hand, pay directly to workers any disability and medical benefits. *Johnson v. Tradewell Stores, Inc.*, 95 Wn.2d 739, 742, 630 P.2d 441 (1981); *See* RCW 51.08.173 (defining "self-insurer"). Self-insured employers also indirectly pay for a worker's pension

6

benefits by paying money into the reserve fund. RCW 51.44.070(1); *Doss*, 183 Wn.2d at 58. DLI then pays the worker the pension. *See* RCW 51.32.060; RCW 51.44.070.

Also relevant to this appeal is the second injury fund. That fund was established to encourage employers to hire workers who already were injured or disabled by providing that in the event of a new injury, the current employer would be responsible only for the disability arising from the new injury. *Jussila v. Dep't of Labor & Indus.*, 59 Wn.2d 772, 778-79, 370 P.2d 582 (1962). This fund serves several purposes:

> First, the fund encourages employers to hire and retain previously disabled workers, providing that the employer hiring the disabled worker will not be liable for a greater disability than what actually results from a later accident. Second, by recognizing that an employer is required only to bear the costs associated with the industrial injuries sustained by its employees, the fund encourages workplace safety and prevents placing unfair financial burdens on employers.

*Crown, Cork & Seal v. Smith*, 171 Wn.2d 866, 872-73, 259 P.3d 151 (2011) (citing *Jussila*, 59 Wn.2d at 778-79). The second injury fund predates the existence of self-insured employers. *See Chicago, Bridge & Iron Co. v. Dep't of Labor & Indus.*, 46 Wn. App. 252, 254-55, 731 P.2d 1 (1986) (stating that the legislature modified the IIA to allow self-insured employers in 1971). However, the legislature in 1977 allowed self-insured employers to get second injury fund relief. *Id.* at 254.

The second injury fund is funded through transfers from the accident fund and through assessments imposed against self-insured employers. *See* RCW 51.44.040. For self-insured employers, the "second injury fund assessment is experience rated based on a

self-insurer's actual usage of the second injury fund in the previous three fiscal years."
WAC 296-15-225. The assessments are calculated, in part, by the claim costs paid by the
self-insured employer that include, but are not limited to, time loss compensation,
permanent partial disability awards, medical bills, and prescriptions. WAC 296-15-225(3)
(outlining the process for calculating the assessment); WAC 296-15-221(4)(a)(ii)
(describing claim costs).

As a worker suffering from a previous disability, the benefits paid to Ms. Ortiz by
UFF were potentially subject to relief from the second injury fund, a fact recognized in
the settlement agreement. It is the error in providing that relief that sparks this appeal.

In addition to agreeing on the standard of review, the parties are in agreement that
this appeal presents a question of statutory construction. They disagree on which statutes
govern, separately arguing RCW 51.32.240 (discussing overpayments), RCW 51.44.142
(defining the self-insured employer overpayment reimbursement fund), or RCW 51.44.040
(defining the second injury fund). We turn to those respective arguments.

Ms. Ortiz[2] argues that the self-insured overpayment statute applies here. However,
the plain language of the statute precludes her argument. RCW 51.44.142 describes the
self-insured employer overpayment reimbursement fund and specifically limits use of the

---

[2] DLI argues that Ms. Ortiz lacks standing in this appeal since the issue is which
entity will have the obligation to seek repayment from her rather than whether she has
any obligation to make repayment. We believe she has sufficient interest in the identity
of her creditor and the integrity of her settlement to have standing.

fund to situations where an overpayment is caused by a reversal on appeal: "Expenditures from the account may be used *only* for reimbursing the reserve fund and self-insured employers for benefits overpaid *during the pendency of board or court appeals* in which the self-insured employer prevails and has not recovered." RCW 51.44.142 (emphasis added). The overpayment statute, RCW 51.32.240, is consistent with this directive:

> (4) Whenever any payment of benefits under this title has been made *pursuant to an adjudication by the department or by order of the board* or any court and *timely appeal therefrom has been made* where the final decision is that any such payment was *made pursuant to an erroneous adjudication*, the recipient thereof shall repay it and recoupment may be made from any future payments due to the recipient on any claim whether state fund or self-insured.

(Emphasis added.)

This fund is inapplicable because there was no original order that later was reversed on appeal. Rather, the self-insured employer was making time loss payments until a permanent settlement was reached. Because the overpayment here was not caused by a decision adverse to the employer that later was reversed, the self-insured employer overpayment reimbursement fund does not apply.

UFF contends that the second injury fund should bear the risk of loss, while DLI argues that the second injury fund cannot bear the loss of the misdirected payment because it is not a purpose of that fund nor can any of that fund be used to cover time loss payments. UFF has the better argument. It properly notes that the legislature limits use of the second injury fund only to the purpose of the fund. "There is . . . a fund to be known

9

and designated as the 'second injury fund,' which may be used *only* for the purpose of *defraying charges against employers* and for supporting return-to-work outcomes for injured workers . . . ." RCW 51.44.040(1) (emphasis added). Because of these purposes, "any rule, which makes it easier for an employer to obtain reimbursement from the fund will tend to support the basic purpose of the fund." *Jussila*, 59 Wn.2d at 779.

In light of the purposes of the fund, we believe it is proper for DLI to reimburse an employer from the second injury fund for the overpayment caused by a backdated pension award. Indeed, DLI thought the same when it authorized the payment to Ms. Ortiz from the second injury fund.

The BIIA also reached the same conclusion in an earlier case, *In re Cuendet*.[3] DLI argues that *Cuendet* was wrongly decided and that this court should not give any deference to that decision.[4] No court has previously interpreted this question.

In *Cuendet* the BIIA allowed second injury funds to go directly to a self-insured employer to repay prior time loss payments. *Id.* at *1. The employer appealed an order

---

[3] No. 99 21825, 2001 WL 1328460 (Wash. Bd. Indus. Ins. Appeals Aug. 14, 2001).

[4] There is some inconsistency on what level of deference should be given to past BIIA decisions. While the Washington Supreme Court has stated that a BIIA opinion interpreting the IIA is "entitled to great deference," this division has previously stated that the court defers to the DLI's interpretation. *Compare Weyerhaeuser Co. v. Tri*, 117 Wn.2d 128, 138, 814 P.2d 629 (1991), *with Dept. of Labor & Indus. v. Slaugh*, 177 Wn. App. 439, 452, 312 P.3d 676 (2013) (citing *Port of Seattle v. Pollution Control Hr'gs Bd.*, 151 Wn.2d 568, 593, 90 P.3d 659 (2004)). Regardless, even where no deference is given, the BIIA's reasoning can be persuasive and we consider *Cuendet* in that light.

placing the employee on the pension rolls and providing second injury fund relief effective December 1, 1998. *Id.* The BIIA took review and ultimately held that the worker was permanently disabled effective September 10, 1998. *Id.* at *3. However, the employer had paid time loss benefits through December 1, 1998. *Id.* at *4 The BIIA recognized that because "Mr. Cuendet's entitlement to permanent total disability benefits has been moved back in time . . ., he may receive a double recovery (time loss compensation paid earlier by the self-insurer and pension benefits paid by the Department through the second injury fund)." *Id.* The BIIA held that it was appropriate for DLI to pay the self-insured employer from the second injury fund for the time loss that the employer had already paid. *Id.*

In granting the employer relief from the second injury fund the BIIA considered the purpose of the second injury fund and the most efficient way to recoup any overpayment. It looked to the decision in *Jussila* that recognized the purpose of the second injury fund is to encourage hiring of previously disabled workers. *Id.* at *5. The BIIA recognized, as that court had, that "[a]ny rule or procedure that makes it easier for an employer to benefit from the fund tends to support this purpose." *Id.* The BIIA also noted that the burden of seeking recoupment will be on DLI under RCW 51.32.240. *Id.* Because of this, the BIIA believed that logistically it was more efficient for DLI to collect any overpayment to the worker:

> The self-insurer is no longer responsible for making any future payments, therefore, it cannot withhold portions of future payments to obtain reimbursement. The Department, on the other hand, has the responsibility

11

to pay pension benefits from the second injury fund and, therefore, the ability to recoup any overpayment efficiently. . . . Thus, for the sake of administrative efficiency, placing the burden of recoupment on the Department is the logical choice.

*Id.*

Nothing in the legislative scheme indicates that the fund cannot be applied for this purpose. Here, because the only limitation the legislature placed on the second injury fund is that it be used to defray charges against employers, we conclude that the reasoning in *Cuendet* is persuasive. Further, DLI conceded below that in the normal situation it would have reimbursed the self-insured employer from the second injury fund rather than send the check to Ms. Ortiz. Report of Proceedings at 7-8. DLI did not because it was unaware this action would result in a double payment for that time period. *Id.* However, DLI had knowledge that Ms. Ortiz had received past time loss payments for the period in question, and, thus, should have been aware of the potential double payment. Clerk's Papers at 66-69 (indicating from the jurisdictional history that time loss payments ended May 2, 2010). The essential question is what should be done in light of the error.

DLI argues that any ruling granting UFF recovery from the second injury fund would essentially require DLI to indemnify the self-insured employer. It states further that this goes against policy because, by self-insuring, employers are assuming their own risks. DLI's argument would be sound if it were not for the applicability of the second injury fund and the policy of protecting employers in order to encourage the hiring of disabled

12

workers. *Jussila*, 59 Wn.2d at 778. Further, the self-insured employer should not have to bear the risk of nonrecovery where DLI made the error that caused the double payment.[5]

From a practical perspective, DLI also is the only party likely to recover any of the excess payments made to Ms. Ortiz. It is the entity that makes the pension payments and can seek recoupment through that process. UFF no longer has any payment obligation to Ms. Ortiz and has less effective means of seeking recovery. These considerations, too, justify placing the burden of recovering DLI's overpayment on that agency.

The order of the superior court is reversed and the BIIA decision is reinstated.

Reversed.

Korsmo, J.

WE CONCUR:

Siddoway, J.

Lawrence-Berrey, A.C.J.

---

[5] The parties also argue over the term "overpayment." DLI argues that any "overpayment" here was UFF's since it was the time loss benefits that UFF paid from 2002-2010 that *retrospectively* should not have been paid since Ms. Ortiz was *retroactively* put on the pension rolls effective 2002. UFF correctly responds that DLI overlooks the fact that second injury fund relief was afforded in this case. The agreement between Ms. Ortiz and UFF did not stipulate that DLI would provide second injury fund relief (nor could it). Rather, the agreement required consideration of second injury fund relief that DLI was obligated to do anyway. *See* RCW 51.16.120 ("[T]he department shall pass upon the application of this section in all cases where benefits are paid for total permanent disability . . . and issue an order thereon appealable by the employer."). Had DLI not granted that relief, UFF would have been responsible for the pension payments for that period. By granting second injury fund relief, DLI, rather than UFF, created the overpayment.