[No. 33990-1-II.   Division Two.   October 24, 2006.]

DI PIETRO TRUCKING COMPANY, *Appellant*, v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Respondent*.

---

694

*Philip A. Talmadge* (of *Talmadge Law Group, P.L.L.C.*), for appellant.

*Robert M. McKenna, Attorney General,* and *James S. Johnson, Assistant,* for respondent.

¶1  HUNT, J. — Di Pietro Trucking Co. appeals a Board of Industrial Insurance Appeals order upholding the Department of Labor and Industries' (L&I) calculation of Di Pietro's increased industrial insurance premium following payment of a work-related death claim. Di Pietro argues that L&I exceeded its authority under RCW 51.16.035 in adopting WAC 296-17-870(3), which allows L&I to increase an employer's industrial insurance premium based on the "average death value" in Washington rather than on the actual cost of the deceased worker's claim. Holding that "average death value," a risk-pooling premium calculation method, is "consistent with recognized [insurance] principles" specified by RCW 51.16.035, we affirm.

## FACTS

### I. BACKGROUND

¶2  In 2001, truck driver Ron DeWitt died from a single-vehicle accident in the course of his employment with Di Pietro Trucking Company, a small, family-owned company. Di Pietro was not at fault. Because DeWitt had no wife or dependents, there were no survivor claims payable from the industrial insurance fund administered by L&I.

¶3  L&I accepted and paid DeWitt's industrial insurance claim for his $872 burial cost. DeWitt's was the first and only death claim for Di Pietro over a 25-year period.

### II. INDUSTRIAL INSURANCE PREMIUM INCREASE

¶4  As a result of DeWitt's death claim, L&I applied WAC 296-17-870(3), calculated Di Pietro's new annual industrial insurance premium using the average cost of death claims in Washington for 2002 (the "average death value"),[1] and increased Di Pietro's annual premium by about $50,000 for

---

[1] Based on death claims for 1999, 2000, and 2001, the 2002 "average death value" in Washington was about $198,000.

2003 and two successive years thereafter.[2] Arguing that L&I should have used the actual cost of DeWitt's death claim to calculate the new premium, Di Pietro protested the disparity between the low amount of DeWitt's claim and the high premium increase based on the "average death value." L&I determined that it had properly calculated Di Pietro's premium under WAC 296-17-870(3) and refused to reduce Di Pietro's premium.

¶5 Di Pietro appealed to the Board of Industrial Insurance Appeals (Board). L&I moved for summary judgment, which the parties argued before an industrial appeals judge (IAJ). In adopting the IAJ's proposed decision, the Board (1) granted L&I's motion for summary judgment, (2) approved L&I's use of the "average death value,"[3] and (3) affirmed L&I's increase in Di Pietro's 2003 industrial insurance premium rate.

### III. APPEAL TO SUPERIOR COURT

¶6 Di Pietro appealed the Board's ruling to superior court under the Administrative Procedure Act (APA), RCW 34.05.570. The superior court heard testimony about whether WAC 296-17-870(3) is consistent with recognized principles of workers' compensation as required by RCW 51.16.035 of the Industrial Insurance Act (IIA), Title 51 RCW.[4]

---

[2] The next year, L&I calculated Di Pietro's 2004 premium based on the 2003 average death value, derived from 2000-2002 average death claims. L&I would engage in a similar process to calculate Di Pietro's 2005 premium. This increase in premiums was to cease at the end of three years if Di Pietro had no more death claims during that period.

[3] The Board agreed with L&I that it (the Board) lacked authority to set aside WAC 296-17-870(3) and L&I's use of the "average death value" to calculate industrial insurance premiums following a death claim.

[4] Di Pietro appealed L&I's premium increase in 2003. In 2005, the legislature amended RCW 51.16.035. For purposes of this appeal, there is no material difference between the 2003 and 2005 versions of RCW 51.16.035; therefore, we cite the current 2005 version. RCW 51.16.035 provides in pertinent part:

(1) [L&I] shall classify all occupations or industries in accordance with their degree of hazard and fix therefor basic rates of premium which shall be:

(a) The lowest necessary to maintain actuarial solvency of the accident and medical aid funds . . . .

¶7 Di Pietro called Cathy Baugh, an underwriting manager at Liberty Northwest Insurance (Liberty) in Oregon. Baugh testified that an employer's industrial insurance premium should reflect the risk of insuring that particular employer. In establishing premium rates, Liberty, as well as other private insurance companies, rely on the National Council on Compensation Insurance (NCCI), a rating and statistical organization.[5] According to Baugh, for premium-rating purposes, the NCCI places greater emphasis on the frequency, rather than the severity or amount, of an employer's industrial insurance claims.

¶8 Dr. William Vasek, senior actuary at L&I, testified that (1) the L&I industrial insurance fund does not recoup actual costs for paid claims; (2) rather, L&I must predict the cost of possible future claims and adjust its premiums accordingly to prefund these anticipated claims. The cost of a worker's death claim depends on his earnings, whether the deceased worker has a surviving spouse and dependents, and if so, their ages and life expectancies.[6] As a

. . . .

(2) [L&I] shall formulate and adopt rules governing the method of premium calculation and collection and providing for a rating system consistent with recognized principles of workers' compensation insurance which shall be designed to stimulate and encourage accident prevention. . . .

. . . .

(4) In providing a retrospective rating plan under RCW 51.18.010, [L&I] may consider each individual retrospective rating group as a single employing entity for purposes of dividends or premium discounts.

Former RCW 51.16.035(1), as codified in 2003, provided:

[L&I] shall classify all occupations or industries in accordance with their degree of hazard and fix therefor basic rates of premium which shall be the lowest necessary to maintain actuarial solvency of the accident and medical aid funds . . . . [L&I] shall formulate and adopt rules and regulations governing the method of premium calculation and collection and providing for a rating system consistent with recognized principles of workers' compensation insurance which shall be designed to stimulate and encourage accident prevention . . . .

[5] NCCI provides ratings based on data it gathers from various states; industrial insurance providers use this information to establish insurance rates. If NCCI underestimates the risk, the insurance provider has the option of increasing premium amounts using a tiered or scheduled rating system to account for risks not reflected in NCCI's rate.

[6] RCW 51.32.050.

result, the amount of a death claim is highly variable, and therefore, it is of little value in predicting the cost of future death claims. Dr. Vasek explained that, although no other state uses the "average death value" to calculate industrial insurance premiums, the frequency of death claims and the "average death value" are more accurate in predicting the cost of future death claims than is the amount of a single past death claim.

¶9 Both expert witnesses agreed that increasing employer industrial insurance premiums in response to death claims and lowering premiums in response to a lack of death claims create an incentive for employers to promote safety.

¶10 The superior court affirmed the Board's grant of summary judgment to L&I. Di Pietro appeals.

## ANALYSIS

¶11 Di Pietro argues that L&I exceeded its legislatively-delegated authority under RCW 51.16.035 when it adopted WAC 296-17-870(3) and used "average death value" for calculating Di Pietro's industrial insurance premium after paying DeWitt's death claim. We have found no published Washington case expressly deciding whether L&I's use of "average death value" to calculate premiums is consistent with recognized principles of industrial insurance[7] and designed to stimulate and to encourage accident prevention, as required by RCW 51.16.035(1) and (2), respectively. Thus, we address an issue of first impression.

### I. STANDARD OF REVIEW

¶12 Under the APA, a plaintiff has the burden to show that an agency acted outside statutorily-granted authority or that an agency erroneously interpreted or

---

[7] As we explain later in our analysis, the Supreme Court's opinion in *WR Enterprises, Inc. v. Department of Labor & Industries*, 147 Wn.2d 213, 218, 53 P.3d 504 (2002), establishes a framework and, to some extent, guiding precedent, for resolving this issue here.

applied the law. RCW 34.05.570. Interpretation of a statute, here, RCW 51.16.035 of the IIA, is a matter of law, which we review de novo. *WR Enters., Inc. v. Dep't of Labor & Indus.*, 147 Wn.2d 213, 218, 53 P.3d 504 (2002). If there are no questions of law involved and the agency has acted within its statutory duties, we will not interfere with the agency's work and decisions. *Wash. State Coal. for Homeless v. Dep't of Soc. & Health Servs.*, 133 Wn.2d 894, 913, 949 P.2d 1291 (1997).

¶13 We interpret statutes to carry out the legislature's intent. *Simpson Inv. Co. v. Dep't of Revenue*, 141 Wn.2d 139, 148-49, 3 P.3d 741 (2000). If a statute is clear on its face, we derive its meaning from the language of the statute. *Kilian v. Atkinson*, 147 Wn.2d 16, 20-22, 50 P.3d 638 (2002). A statute is not ambiguous simply because different interpretations are conceivable. *Kilian*, 147 Wn.2d at 22. Nor is an undefined term in a statute ambiguous if the term has a broad or a well-accepted, ordinary meaning. *Coal. for Homeless*, 133 Wn.2d at 906-07.

## II. Industrial Insurance Act

¶14 The State of Washington established L&I and codified state workers' compensation laws in 1911, when the legislature enacted the IIA. Regardless of fault, the IIA provides workers injured on the job with timely monetary relief from funds collected annually from employers according to calculation formulae and experience ratings set by L&I. *See* Laws of 1911, ch. 74; RCW 51.04.010.

> The benefits injured workers receive under the [IIA] are paid from three state funds: the medical aid, accident, and supplemental pension funds. The accident fund pays benefits to workers who were injured on the job or *to the worker's family or dependents if the worker dies*. Chapter 51.32 RCW. The medical aid fund covers medical treatment received by injured workers. RCW 51.04.030. The supplemental pension fund pays cost-of-living increases to workers with total and permanent disability and *to the families or dependents of workers who have died.*

RCW 51.32.073, .075. The medical aid, accident, and supplemental pension funds are supported by the premiums collected from employers by [L&I].

*WR Enters.*, 147 Wn.2d at 216-17 (emphasis added) (footnote omitted).

■ ¶15 Unlike the majority of states, Washington's workers' compensation program is state administered.[8] This state-administered fund is the sole means of obtaining industrial insurance coverage in our state unless the employer qualifies for self-insurance. RCW 51.04.010, .020. The legislature requires that L&I administer this fund to assure its solvency. RCW 51.16.035.[9] To that end, the legislature has historically required employers to pay increased insurance premiums into the fund when an employee dies on the job.

### A. Historical Calculation of Industrial Insurance Premiums

¶16 The parties here have not expressly stipulated to the following historical facts depicting the history of premium rate setting for Washington's industrial insurance accident and medical aid funds, as did the parties in *WR Enterprises.* But Di Pietro cites *WR Enterprises* as supporting authority in its brief. In that case, as here, L&I called Dr. William Vasek to testify about industrial insurance premium rate setting for employers paying into this fund from which workers are compensated for injuries. Finding this history to be a helpful, clear summary, we recite it, in part, below:

"(1) [L&I] was formed in 1911 to administer the newly adopted [IIA] for the State of Washington.

---

[8] Washington is one of only five states that provide an exclusive, state-administered workers' compensation insurance program. Emily Richardson Roselli, *Workers' Compensation Obligations to a State Entity Under Bankruptcy Law: Which Test Should Govern How an Obligation is Characterized for Tax Priority Purposes?*, 21 EMORY BANKR. DEV. J. 711, 717 n.28 (2005).

[9] In 1971, the legislature changed from requiring class-based solvency, former RCW 51.16.020 (1961), to fund-based solvency. *WR Enters.*, 147 Wn.2d at 222.

"(2) Under the terms of the [IIA], all hazardous industries operating in the state were segregated into classes by industry with varying degree[s] of hazard.

"(3) The [IIA] provided compensation to workers injured on the job regardless of fault.

"(4) A fund was established, the "accident fund", which was to fund these benefits.

"(5) To provide the necessary revenue, a premium rate was established for each class which was paid by employers for their workers.

"(6) Under the [IIA] the legislature directed that each class be self-sufficient and be required to meet the cost of all accidents occurring in that class.

"(7) No class was to be liable for depletion of the accident fund for losses from accidents occurring in any other class.

"(8) [L&I] was directed to adjust the premium rate for each class as may be necessary from time to time to allow the class to cover the costs of its accidents plus its share of the general expense of administration.

"(9) In 1917 the [IIA] was amended to include a medical aid fund which, like the accident fund, was funded by each separate independent class with premiums governed solely by the claims from that class.

". . . .

"(12) However, *during the past 20 years, [L&I] changed its rate-setting procedure and now sets premiums for both funds based upon the performance of all classifications statewide and not solely upon the performance of the individual classification or subclassification.*

"(13) *This has resulted in some employers and classifications paying excess premiums to cover losses suffered by classifications other than their own.*

"(14) [L&I] believes that it received authority to make this change from RCW 51.16.035 adopted in 1971.

"(15) The 1971 amendment expanded coverage of the [IIA] to include nearly all industries including non-hazardous occupations."

*WR Enters.*, 147 Wn.2d at 217-18 (emphasis added) (quoting Clerk's Papers (CP) at 334-35).

¶17 In 1931, the State of Washington first adopted "experience rating," i.e., a particular employer's *nonfatal* claims history, to set employers' industrial insurance premium rates. *See* LAWS OF 1931, ch. 104, § 1. In determining these experience-based premium rates, the legislature has historically specified increases for death claims. In 1931, for example, the legislature set a fixed amount of $4,000, "instead of the actual cost," to be factored into the employer's "experience cost" for any "injury resulting in the death or total permanent disability" of a worker. LAWS OF 1931, ch. 104, § 1. Since 1931, our legislature has changed the death-and-total-disability-claim fixed amount several times.

¶18 In 1961, the legislature removed the fixed amount for total disability and instead based the premium rate on the *average cost of total disability claims*. LAWS OF 1961, ch. 274, § 6. The legislature thus expressly adopted the *average cost* of total disability claims, instead of the actual cost of a specific disability claim or an individual employer's actual claim-experience history.

¶19 In 1971, the legislature enacted another major change to the industrial insurance premium-rate-setting scheme: It repealed its statutory-based, legislatively dictated rate setting and delegated rate setting instead to L&I. In so doing, the legislature granted L&I broad discretion to create a system for classifying occupations and industries based on their degrees of hazard and to fix corresponding industrial insurance premium rates. LAWS OF 1971, 1st Ex. Sess., ch. 289, § 16; RCW 51.16.035. Rather than dictate fixed rates or a specific methodology, as it had done in the past, the legislature required only that the system be "consistent with *recognized principles of workmen's compensation insurance*" and "designed to stimulate and encourage accident prevention." LAWS OF 1971, 1st Ex. Sess., ch. 289, § 16; RCW 51.16.035(2) (emphasis added). The legislature did not further define these parameters.

¶20 Instead, the legislature authorized L&I to "readjust rates in accordance with the rating system" as L&I deems necessary to accomplish twin objectives: (1) to set the lowest

necessary premium rates "to maintain actuarial solvency of the accident and medical aid funds in accordance with recognized insurance principles" and (2) "to limit fluctuations in premium rates."[10] RCW 51.16.035(2), (1)(a), (1)(b). "At the same time the Legislature repealed former RCW 51.16.020, eliminating class-based solvency language from the rate-setting scheme." *WR Enters.*, 147 Wn.2d at 222.

¶21 Since the legislature's 1971 amendment to RCW 51.16.035, L&I has generally calculated industrial insurance premium rates as follows:

The formula currently applied by [L&I] has several steps. First, [L&I] classifies all occupations or industries in accordance with their degree of hazard. Then, it evaluates the performance of both the medical aid and accident funds overall and determines if rates need to be adjusted to maintain the solvency of the fund. If rates need to be adjusted, the experience of each class is compared to that of the overall fund and the rates are adjusted accordingly. That is, if a particular class performed better than the fund as a whole (incurred fewer losses per hours worked), then that class's base rate would be lowered. Alternatively, if a particular class suffered more losses per hours worked in comparison to the overall fund, then its base rate would be raised. Such adjustments maintain solvency of the fund.

Once the base rates are set, [L&I] calculates the premium an employer pays for each classification by first adding the base rates for each classification for the accident and medical aid fund together. This number is multiplied by the employer's experience factor. The experience factor is calculated by comparing the past costs or losses incurred by an employer to the expected losses within that classification. This amount is then added to the universal rate[11] for the supplemental pension fund. Finally, the combination of the rates for the accident, medical aid and supplemental pension funds is multiplied by the number of reported worker hours in that classification.

---

[10] Neither of these two objectives are at issue in this appeal.

[11] The universal rate is a flat rate charged to all employers, regardless of risk classification for supplemental pension fund premiums under RCW 51.32.073. *WR Enters.*, 147 Wn.2d at 228-29.

This is the amount an employer pays for workers' compensation insurance for each classification.

*WR Enters.*, 147 Wn.2d at 219 (footnotes omitted).

B. WAC 296-17-870(3), "Average Death Value"

¶22 In creating this premium-rate-setting system, L&I has found it necessary to establish a different method for death claims. Part of the reason for this different death-claim treatment is to maintain the statutorily-required solvency of the fund into which employers pay premiums and from which workers' industrial insurance claims are paid. RCW 51.16.035(1). The parties do not dispute that L&I is authorized to recalculate an employer's industrial insurance premium following a worker's death claim. Rather, they disagree about whether L&I exceeded its statutory authority under RCW 51.16.035 when it promulgated WAC 296-17-870(3)'s use of "average death value" to calculate the increased premium an employer must pay following a worker's death claim.[12]

¶23 WAC 296-17-870(3)[13] provides:

Each fatality occurring to a worker included within the mandatory or elective coverage of Title 51 RCW shall be assigned the "average death value." The "average death value" shall be the average incurred cost for all such fatalities occurring during the experience period. . . .

---

[12] Di Pietro contends that RCW 51.16.035 is unambiguous and, therefore, we should not accord deference to L&I's interpretation. We need not resolve this issue because we would reach the same decision under either the plain language or the agency-deference standard.

[13] Contemporaneously with the legislature's amendment to RCW 51.16.035, *supra* note 4, L&I also changed WAC 296-17-870(3) in 2005. As with RCW 51.16.035, there is no material difference between the 2003 and 2005 versions of WAC 296-17-870(3) for purposes of this appeal. Therefore, we cite the current 2005 version of WAC 296-17-870(3) in this opinion.

Former WAC 296-17-870(3), as effective in 2003, stated:

Each fatality occurring to a worker included within the mandatory or elective coverage of Title 51 RCW shall be assigned the "average death value," said value to be the average incurred cost for all such fatalities occurring during the experience period. . . .

Under this rule, when a worker dies from an industrial accident, L&I uses the average cost of all industrial insurance death claims in Washington to calculate the deceased worker's employer's insurance premiums for the next three years.[14] If that employer has no additional death claims during this three-year period, then the premium increase attributable to the death claim ceases and the employer's premium is again calculated as it was before the three-year death-claim increase. If, however, this same employer has additional worker death claims during this three-year period, L&I adds additional per-death premiums based on the average death value at the time of each new death claim.

¶24  Di Pietro argues that L&I's use of an "average death value" exceeds its legislative authority under RCW 51-.16.035 because (1) "average death value" is not an accepted principle of industrial insurance premium calculation and (2) it does not provide an employer incentive to maintain a safe workplace. Di Pietro contends that instead, L&I should calculate premiums based on an individual employer's experience and the actual cost of a specific worker's death claim.

¶25  Di Pietro's argument is analogous to WR Enterprises' (WRE) argument that RCW 51.16.035 absolutely bars cross-class subsidies.[15] The Supreme Court rejected his argument in *WR Enterprises*. WRE argued:

---

[14] *See supra* notes 1, 2.

[15] Taken in isolation, Di Pietro's argument is compelling, especially in light of the dramatic contrast between Di Pietro's actual death claim for only $872 funeral expenses and L&I's resultant $50,000 increase in its industrial insurance premium. But our legislature has not empowered the courts to decide on a case-by-case basis whether a particular industrial insurance premium adjustment is inequitable and, therefore, subject to judicial revision. Rather, as we noted earlier, the legislature has delegated that authority to L&I.

Furthermore, if, as Di Pietro argues, L&I has exceeded its legislatively delegated authority in using average death value to calculate death-claim-based industrial insurance premium increases, we are aware of no legislative attempt to "correct" L&I's practice.

Here, just as the Supreme Court rejected WRE's similar argument, we must reject Di Pietro's. To illustrate the similarities between these two employers' arguments, we quote an excerpt from Justice Sanders' dissent in *WR Enterprises*, which Di Pietro's argument mirrors:

[T]hat [L&I] sets premiums based upon the performance of all classifications and that the practice has "resulted in some employers and classifications paying excess premiums to cover losses suffered by classifications other than their own" as conclusive evidence that [L&I's] rate-setting methods violate RCW 51.16.035. CP at 5. WRE takes this language out of context. The declaration of Dr. William Vasek more fully explains the stipulation.

[L&I] stipulated that some employers and classifications have paid excess premiums to cover the losses suffered by other employers and classifications. This "excess premium" occurs because [L&I], like any insurance company, cannot predict with 100 [percent] accuracy the actual covered losses sustained. Insurers charge guaranteed cost premiums to cover the losses expected from injuries occurring within the coverage period. Such *prospective charging is the generally accepted insurance method.*

. . . .

---

This dispute arose when [WRE] learned [L&I] levied industrial insurance premiums which were excessive and grossly disproportionate to the risk experienced in its class of industry.

The parties agree *L&I's current rate-setting structure makes employers in comparatively low-risk industries pay disproportionately high premiums to cover losses incurred by higher-risk industries. Although such rate-setting violates the statute as construed in prior decisions of this court, the majority nevertheless approves L&I's practice.*

. . . .

. . . [T]hree times in the decade following the 1971 amendments we held L&I is prohibited by statute from charging employers rates or costs to recover losses or expenses incurred by classes other than their own. And here we have not only "considerable factual information," *Pan Pac. Trading Corp. [v. Dep't of Labor & Indus.]*, 88 Wn.2d [347,] 352, [560 P.2d 1141 (1977)] that rates charged to WRE are excessive in proportion to the risk inherent in its industry but, in point of fact, these parties *stipulate* L&I's rate structure "has resulted in some employers and classifications paying excess premiums to cover losses suffered by classifications other than their own." Clerk's Papers (CP) at 5.

*WR Enters.*, 147 Wn.2d at 231-34 (Sanders, J., dissenting) (emphasis added). As does Di Pietro here, Justice Sanders goes on to decry (1) the *WR Enterprises* majority's abandonment of the long-standing principle that industrial insurance premiums should be based on an industry's hazard rating and a particular employer's actual risk experience and (2) its allowing L&I to apply equal premiums to safe and nonsafe employers alike.

Just as the Supreme Court majority disagreed with Justice Sanders' dissenting position in *WR Enterprises*, we must reject Di Pietro's analogous argument here.

> Some employers and classifications will have paid amounts in excess of what the costs will eventually be for the insurance coverage period. Other employers and classifications will have paid premiums less than the costs suffered during the insurance coverage period. However, in succeeding coverage periods, there will be reversals as the costs incurred will vary considerably from period to period depending on the size of the class. . . . *This is the accepted and recognized insurance principle.*

CP (Vasek Decl.) at 240-41.

*WR Enters.*, 147 Wn.2d at 225-26 (emphasis added).

¶26 WRE challenged L&I's procedures for setting industrial insurance premiums under RCW 51.16.035. The court explained that employer premiums are based, in part, on the type of work an employee performs, which L&I classifies into risk categories. *WR Enters.*, 147 Wn.2d at 219. L&I may also adjust employer premiums based on claim-payment losses sustained by the general workers' compensation fund as a whole, including claim-payment losses from other work classifications. In other words, some employers could be required to pay premiums that exceed their classifications' losses for the year in order to cover losses incurred by employers in other classifications,[16] a practice that a majority of our Supreme Court has upheld following the legislature's 1971 amendments to the IIA. *WR Enters.*, 147 Wn.2d at 217, 219-20.

¶27 Parallel to Di Pietro's argument here, WRE argued:

> [RCW 51.16.035] requires that the calculations be based entirely on risk classification so that each class is independent and self-sufficient and no class is liable for depletion of the fund for losses suffered by any other class. WRE is concerned

---

[16] In general, each employer is required to pay a base or minimum premium rate, which L&I calculates for various work classifications, depending, in part, on the work hazards of each classification. In addition, L&I adjusts classifications' minimum premium rates based on losses sustained by the state industrial insurance fund as a whole, which, as *WR Enterprises* notes, results in some work classification employers essentially paying for losses sustained by other unrelated work classification employers.

An individual employer's experience factor, however, may increase or decrease that employer's actual premium (base rate + experience factor).

primarily with [L&I's] practice of adjusting each class's accident and medical aid fund base rates based on a comparison of each class's experience to that of each fund as a whole. *It argues that [L&I] should instead determine the adjustments needed to maintain solvency only by looking at each class individually.*

*WR Enters.*, 147 Wn.2d at 220 (emphasis added).

¶28 In rejecting WRE's argument that each class should bear its own costs, without reference to the fund's losses as a whole, the court noted:

WRE bases its argument on the history of the [IIA], contending that the very foundation of the [IIA] is the requirement that no class of workers shall be liable for the depletion of the fund for accidents in any other class. This assertion, however, *ignores the 1971 amendments* to the [IIA], *particularly RCW 51.16.035.* It is true that when the [IIA] was passed in 1911 the Legislature intended each class to be self sufficient. *See* LAWS OF 1911, ch. 74. Former RCW 51.16.020 (1961), which provided the method for premium rate-setting, made that clear. However, the Legislature repealed former RCW 51.16.020 in 1971 and enacted RCW 51.16.035 in its place. *Significantly, the Legislature eliminated language in former RCW 51.16.020 providing that "no class shall be liable for the depletion of the accident fund for accidents happening in any other class."* It also deleted language requiring self sufficiency. Further, RCW 51.16.035 eliminated the former requirement that the condition of "each such class or sub-class account" be taken into consideration when determining the base rate. Former RCW 51.16.020. *In short, none of the provisions requiring self sufficiency and independence between classes survived the 1971 amendments to the [IIA].*

*WR Enters.*, 147 Wn.2d at 220-21 (emphasis added) (footnote omitted). The court further noted, "Thus, while WRE's challenge here depends upon a determination by this court that the Legislature intended that [L&I] continue to set rates based on class-based solvency, the repeal of RCW 51.16.020 and the language of RCW 51.16.035 do not support such a conclusion." *WR Enters.*, 147 Wn.2d at 222.

¶29  Similarly, the repeal of RCW 51.16.020 and the language of RCW 51.16.035 do not support Di Pietro's argument that the legislature intended L&I to set death-claim insurance premium rates based on an individual employer's claim experience history or on the cost of a deceased worker's actual death-claim amount. In essence, the Supreme Court in *WR Enterprises* acknowledged that the legislature's 1971 amendment to the IIA shifted significantly from its earlier classification-based risk and premium assessment system to a more generalized risk-pooling system based on the state's industrial insurance fund as a whole. *WR Enters.*, 147 Wn.2d at 220, 228.

## C. Consistent with Recognized Industrial Insurance Principles

¶30  "Under RCW 51.16.035, recognized insurance principles govern whether [L&I] may base its method for maintaining solvency on each of the funds or whether solvency must be determined class by class." *WR Enters.*, 147 Wn.2d at 226. We put aside for the moment specific names of industrial insurance premium-rate-setting methods. We focus first instead on the *WR Enterprise* court's express holding that L&I's post-1971 RCW 51.16.020 amendment adaptations, specifically including "risk pooling," are consistent with recognized principles of industrial insurance.

### 1. Risk pooling

¶31  The Supreme Court's express acknowledgement of risk pooling as a recognized principle of industrial insurance pertains here:

> The third principle at issue in rate-setting is risk pooling. Risk pooling is the practice of *pooling those with greater and lesser risks* together to better account for and minimize the unpredictable risk for everyone.

*WR Enters.*, 147 Wn.2d at 226 (emphasis added).[17] The court held that (1) risk pooling is "in accordance with recognized insurance principles," (2) L&I is not required to calculate the premium rate for an individual risk classification based solely on that risk classification's accident and safety history, and (3) L&I's practice of evaluating overall fund performance and determining whether the premium rate for a particular risk classification needs to be adjusted to maintain the fund's solvency is within its legislatively delegated authority under RCW 51.16.035. *WR Enters.*, 147 Wn.2d at 226, 228.

¶32 Here, L&I justifies its use of average death value, when calculating premiums following death claims, for reasons analogous to the risk-pooling objectives and fund-solvency rationale that the Supreme Court upheld in *WR Enterprises*. Although *WR Enterprises'* specific circumstances and pooled risks differed from Di Pietro's, the underlying risk-pooling principles are essentially the same: both pool "greater and lesser risks together to better account for and minimize the unpredictable risk for everyone" because "an aggregated pool of risks is much more predictable than the average risk within a given pool." *WR Enters.*, 147 Wn.2d at 226. In *WR Enterprises*, the court acknowledged risk pooling, incorporated by L&I into its rate-setting method, as an accepted industrial insurance principle. *WR Enters.*, 147 Wn.2d at 226.

---

[17] The full quote, with the other two principles, reads as follows:

There are several accepted principles incorporated by [L&I] into its rate-setting method. First is that insurance is prospective and does not recoup for past losses; therefore, *the accident and medical aid funds must be prefunded.* Prefunding means that premiums paid during a given year are intended to fully fund the expected costs for that year. Second, *the funds must include a contingency reserve* so that benefits will not be prematurely terminated or reduced because of future unanticipated losses. This contingency reserve ensures that the funds from which benefits are paid remain solvent. The third principle at issue in rate-setting is risk pooling. *Risk pooling is the practice of pooling those with greater and lesser risks together to better account for and minimize the unpredictable risk for everyone. An aggregated pool of risks is much more predictable than the average risk within a given pool.*

*WR Enters.*, 147 Wn.2d at 226 (emphasis added) (citation omitted).

¶33 The essential facts and arguments in *WR Enterprises* sufficiently parallel those here such that the *WR Enterprises* rationale and holding should apply to Di Pietro's case.[18] Both cases involve (1) the scope of L&I's authority under RCW 51.16.035, (2) L&I's system of industrial insurance premium calculation based on rates derived from pools broader than an individual employer's own experience rating, and (3) employers' arguments that RCW 51.16.035 requires a more individualized premium-rate-setting system. Just as the Supreme Court rejected WRE's argument, we similarly reject Di Pietro's.

¶34 Moreover, Di Pietro did not controvert L&I's explanation that workers' death claims differ significantly from nonfatal claims because the amount the industrial insurance fund pays out to satisfy a death claim does not depend on the degree of hazard in the workplace, the seriousness of the accident, or even the likelihood of its reoccurrence and injury to others.[19] Rather, as we explain at the beginning of this opinion, the amount of a worker's death claim

[18] We note, however, two differences between the circumstances in *WR Enterprises* and this case, neither of which affects our holding here: First, Di Pietro focuses on its own experience factor rather than on the trucking industry's classification base rate. Second, Di Pietro seeks an individualized system based on a single employer, unconnected to other individual employers in the same classification or in any classification. WRE, however, argued for a somewhat broader individualized system based on a particular work classification, unconnected to other work classifications, in the context of employer industrial insurance premium contributions to the workers' accident and medical aid compensation funds and to the supplemental pension fund, from which L&I pays cost of living increases to permanently disabled workers and to dependents of workers who have died.

[19] Nonetheless, the likelihood of a worker's serious injury resulting in death, or even multiple worker deaths, is already reflected to some extent in that particular industry's risk classification and corresponding base premium rate. As the Supreme Court recognized in reciting the last insurance principle in its list of four: "The final principle embodied in [L&I's] method is risk classification. Essentially, rates must reflect risk and those with a higher risk should pay higher premiums." *WR Enters.*, 147 Wn.2d at 226-27.

In the case of death claims, however, a higher risk of multiple deaths is reflected in the actual number of death claims, with corresponding multiple premium increases based on average death-claim values. Consequently, although it may be standard practice to look at a specific employer's experience factors when setting industrial insurance premium rates for employers with no worker death claims, such is not the case for setting premium rates after a death claim.

depends on nonworkplace-hazard factors outside the employer's control, such as whether the deceased worker is married, has children or other dependents entitled to survivor benefits, and these survivors' life expectancies.[20]

¶35 In accord, Baugh and Dr. Vasek—the same expert on whom the Supreme Court relied in *WR Enterprises*—testified here that (1) when calculating an employer's industrial insurance premium, insurance providers must predict the possibility or risk of future claims and their potential cost and (2) the cost of a particular claim does not necessarily relate to the seriousness of an accident or the likelihood that it will occur again. According to Dr. Vasek, (1) the overall cost of a death claim depends, not on the severity of the accident,[21] but rather on the deceased worker's wages at the time of death and the number and ages of his survivors, if any;[22] (2) thus, a previous small death claim would not necessarily predict either the likelihood or the cost of a future death claim, which he described as "pretty much luck"; (3) Washington's death claims for fiscal years 2000-2002 ranged from $0 to $1,280,000; therefore, (4) in order to predict future costs of claims for an employer, L&I considers both a particular employer's history of worker death claims and the average cost of death claims in Washington.

¶36 By using the costs of other death claims to calculate an employer's premium, L&I is essentially pooling risk from all death claims, small and large, to account for the

---

[20] In contrast, the amount L&I pays for nonfatal industrial claims depends on the type and extent of the worker's injury, the likelihood and cost of rehabilitation and continued employment of that worker, and the extent of that worker's disability, if any. Ch. 296-17 WAC.

[21] In response to a question about whether "a more severe accident is going to result in higher medical bills," Dr. Vasek testified: "Actually, probably the most severe accident will result in [the] person dying immediately, and if there is no survivor, we're basically paying the burial amount on that claim." Report of Proceedings at 57.

[22] If there are no survivors, the fund does not pay the worker's pension to his estate.

unpredictability of costs in future death claims.[23] And although the court in *WR Enterprises* did not specifically address death claims and their resultant increase in industrial insurance premiums, we reiterate that the court acknowledged risk pooling as an acceptable industrial insurance principle that comports with RCW 51.16.035. Here, Dr. Vasek, the same expert who testified in *WR Enterprises*, expressly testified that average death value is a recognized industrial insurance principle.

¶37 Just as Di Pietro argues here, WRE argued that "[L&I's] rate-setting method results in some employers and classifications paying excess premiums to cover losses suffered by classifications other than their own." *WR Enters.*, 147 Wn.2d at 227.[24] In rejecting WRE's argument, the

---

[23] Other states account for this same risk and unpredictability by using a tiered or scheduled rating system instead of Washington's cost averaging system.

[24] In *WR Enterprises*, the Supreme Court noted WRE's criticism of L&I's rate calculation methods and a 1998 Workers' Compensation System Performance Audit recommendation that L&I change its methods, which give " 'equal weight to serious and non-serious claims.' " *WR Enters.*, 147 Wn.2d at 227 n.11 (quoting CP at 83).

> The report recommended that [L&I] evaluate loss development factors for serious and nonserious cases; that it construct a formula to provide returns in proportion to each employers' contribution to the excess reserve (adjust the Accident Fund and Medical Aid Rates by an equal percentage); and that [L&I] eliminate the retrospective premium return adjustment in rate-making.

> In response to the recommendations[, L&I] commissioned the Milliman & Robertson firm to investigate the selection method for the separation point between serious and nonserious injury utilized by [L&I]. The firm concluded that [L&I's] method "conforms with sound actuarial standards and principles." CP at 172 (Decl. of Glenn J. Pruiksma).

*WR Enters.*, 147 Wn.2d at 227 n.11.

Rejecting this 1998 audit, the court ruled:

> This audit does not support WRE's argument. Significantly, the audit concluded that *[L&I's] overall rate-making represents an acceptable actuarial approach.* It does not criticize [L&I] for its fund-based approach to rate-setting and does not recommend that cross-subsidy issues present in classification rate-making be remedied by establishing separate accident and medical aid funds for each classification. Aside from the fact that the audit report is merely a preliminary report, and therefore of questionable value, *we find nothing in the report to support WRE's contention that [L&I's] practice of considering over-all fund solvency when setting classification rates violates RCW 51.16.035 or accepted insurance principles.*

> We hold that [L&I's] practice of comparing each class's experience to each of the medical aid and accident funds once the occupations have been classified

Supreme Court approved L&I's risk-pooling methods. And risk pooling is the principle L&I uses in calculating post-death-claim premiums here. L&I adjusts industrial insurance premiums for a single employer having a single worker-death claim, based on all death claims from all employers. In so doing, L&I minimizes the unpredictability of death-claim premium increases for all job classifications and ensures that the workers' compensation claim fund remains solvent for payment of future claims, as directed by the legislature in RCW 51.16.035. *See WR Enters.*, 147 Wn.2d at 224, 226.

¶38 Thus, in light of *WR Enterprises'* upholding risk pooling as an accepted industrial insurance principle, Di Pietro's point that no other state uses the average death-claim method does not persuade us to reject L&I's method of risk-pooling average death values as "unrecognized" or not based on an accepted insurance principle.

2. Legislative approval

¶39 Furthermore, in *WR Enterprises*, our Supreme Court not only expressly approved risk pooling as a recognized insurance principle but also clearly rejected the principle Di Pietro advances here—that the statute requires an employer's premiums to be strictly individualized, particularly with regard to a specific employer's historical claim experience. *WR Enters.*, 147 Wn.2d at 224-26.[25] Nonetheless, Di Pietro argues that (1) NCCI, treatises, and other insurance providers do not use or endorse

---

complies with RCW 51.16.035 and that [L&I's] method for setting premium rates for the medical aid and accident funds is consistent with recognized insurance principles.

*WR Enters.*, 147 Wn.2d at 228 (emphasis added).

[25] In *WR Enterprises*, the court also considered whether L&I could charge all employers the same amount for the supplemental pension fund. *WR Enters.*, 147 Wn.2d at 228-29. The court determined that L&I could charge a flat amount to all employers, regardless of worker disability or death losses suffered by each risk classification. *WR Enters.*, 147 Wn.2d at 230. This issue is applicable here because, with the "average death value," each employer who has a death claim would be affected the same way. Although RCW 51.16.035 does not govern

the "average death value" in calculating employers' industrial insurance premiums and (2) therefore, this risk-pooling method is not a valid industrial insurance principle. This argument is unpersuasive.

¶40 RCW 51.16.035 does not require L&I to model its rating system on other states' systems, the NCCI, or a legal treatise. Rather, the legislature granted L&I broad discretion to consider *any* source, past *or* present,[26] so long as the industrial insurance premium calculation method is "recognized." According to *Webster's Dictionary*, "recognized" ordinarily means "something that has been perceived before" or "[t]o identify or know from previous experience or knowledge." WEBSTER'S II NEW COLLEGE DICTIONARY 926 (1999). And, as we have previously noted, according to our Supreme Court, the risk-pooling method is recognized as an accepted insurance calculation principle. *WR Enters.*, 147 Wn.2d at 226.

¶41 As L&I points out, industrial insurance claims resulting from deaths have historically resulted in higher premiums based, not on actual claim costs, but on a flat, dollar amount or cost averaging. In 1931, the IIA stated,

> [I]n so computing the cost of experience of any employer the fixed sum of four thousand dollars ($4,000) shall be charged against his experience for each injury resulting in the death . . . of a workman instead of the actual cost to the accident fund of such injury.

LAWS OF 1931, ch. 104, § 1. In 1961, the legislature amended the IIA by replacing a specific sum with the average cost of pension fund fatal injury claims:

> [I]n so computing the cost experience of any employer, seventy-five percent of the average cost of pension claims shall be

supplemental pensions, the *WR Enterprises* court, nevertheless, recognized another workers' compensation principle applicable to Di Pietro's case.

[26] *Cf. Coal. for Homeless*, 133 Wn.2d at 906-07 ("statutory definition of 'child welfare services' is broad and does not create an individual right to a *specific kind* of service. . . . [A] statute is not ambiguous merely because it states a duty in general terms and provides an agency discretion to determine the ways in which the duty may be met" (citation omitted)).

charged against his experience for each injury resulting in death . . . of a workman instead of the actual cost to the accident fund of such injury.

Laws of 1961, ch. 274, § 6.

¶42 Historically, our legislature required L&I to average costs in death claims and to apply this average when calculating employer industrial insurance premiums. More importantly, the legislature prohibited L&I from using the actual cost of a worker's death claim. Washington was not alone; at least one other state, West Virginia, followed a similar rule. *See Peerless Coal & Coke Co. v. State Comp. Comm'r*, 113 W. Va. 6, 9, 166 S.E. 529 (1932).[27] Thus, the "average death cost" is a historically "recognized" industrial insurance calculation principle within the plain meaning of the word.

### 3. Summary

¶43 To summarize, as we previously noted, (1) our legislature granted L&I broad discretion to create a rating system and a process for calculating industrial insurance premiums, requiring that the system be consistent with "recognized principles of workers' compensation insurance," RCW 51.16.035; (2) RCW 51.16.035 does not require that L&I's rate-setting system incorporate any specific

---

[27] In upholding the average death value method for calculating industrial insurance premiums, the West Virginia Supreme Court noted:

The ground upon which relief is sought is that because the fatally injured employees had no dependents, and nothing was paid out of the fund for dependents, no charge against petitioner's account was warranted. The statute seems to make no distinction between fatal accidents burdensome to the fund and those not burdensome. It says that in fatal cases the employer's account shall be charged with the *average* cost of such cases to the fund. This is the legislative scheme for the formation of rates of premiums by which a solvent fund is maintained sufficient to pay all liabilities on it, including those arising from non-fatal cases and permanent disability cases under 85 [percent] disability, and to create a reasonable surplus in each group. Each subscriber is presumed to know the extent of the burdens imposed, as well as the benefits and protections afforded, by the [Workmen's Compensation Act]. *Whether the scheme of fixing the rate for premiums is wise, will not be determined by the courts. That is a question to be dealt with by the legislature.*

*Peerless*, 113 W. Va. at 10-11 (some emphasis added).

method or process of calculation; (3) rather, L&I must set rates consistent with recognized workers' compensation insurance *principles*; and (4) L&I's WAC 296-17-870 risk-pooling system is consistent with such recognized principles, according to our Supreme Court in *WR Enterprises*.

¶44 Moreover, WAC 296-17-870(3) has existed since 1973. L&I has applied it for over 30 years without significant change. If the legislature believed that L&I's use of "average death value" in setting premium rates in response to death claims was not consistent with recognized industrial insurance principles, as it intended, then the legislature could have prohibited L&I's use of average death value or required L&I to use a different method when the legislature amended the IIA in any one of its amendments to RCW 51.16.035 since WAC 296-17-870(3)'s adoption. *See* LAWS OF 2005, ch. 410, § 1; LAWS OF 1999, ch. 7, § 8; LAWS OF 1989, ch. 49, § 1; LAWS OF 1977, 1st Ex. Sess., ch. 350, § 24.

¶45 Applying both *WR Enterprises*' rationale and holding, we hold that (1) "average death value," a risk-pooling premium calculation method, is "in accordance with recognized insurance principles"; (2) L&I is not required to calculate the postdeath-claim premium rate for an individual employer solely on the basis of that employer's performance; and (3) L&I's practice of evaluating overall insurance fund performance and average death value, to determine the premium charged to an employer with an employee death claim, is within L&I's legislatively delegated authority under RCW 51.16.035.

## D. Accident Prevention

¶46 Di Pietro next argues that WAC 296-17-870(3)'s "average death value" does not stimulate and encourage accident prevention because the rule treats employers with small claims the same as it treats employers with large claims, regardless of fault, thereby providing employers no incentive for workplace safety. The record does not support this argument.

¶47 Baugh and Dr. Vasek both testified that the increase in an employer's insurance premium following a worker's death claim is the incentive for safety in the workplace.[28] And neither expert witness testified that a relatively smaller premium increase would create no incentive for workplace safety. All employers are required to pay an increased premium following a death claim, and it is this increase, together with a desire to avoid subsequent similar increases, that encourages accident prevention. Thus, Di Pietro's argument fails.

¶48 Di Pietro further contends that industrial insurance premium rates should distinguish between culpable and nonculpable employers. But by conscious legislative design, Washington's workers' compensation program does not depend on either an employer's or an employee's culpability in a workplace injury. RCW 51.04.010. Instead, Washington provides no-fault industrial insurance for all employments, and L&I is required to insure all employers, regardless of culpability or workplace safety history. RCW 51.04.010.

¶49 Contrary to Di Pietro's argument, WAC 296-17--870(3) does stimulate and encourage accident prevention: if there is a workplace fatality, L&I recomputes and increases that employer's industrial insurance premium based on the average death-claim cost. This increased premium is an incentive for the employer to avoid potentially fatal accidents and the resultant worker death claims.

---

[28] Dr. Vasek acknowledged that employers whose workers have large death claims will have *less* incentive for workplace safety if the actual costs of these claims exceed the "average death value" because such employers experience the same premium increase as employers whose workers have small death claims. Nonetheless, that one employer's incentive for workplace safety may be lower as compared to another employer, is still an incentive because, as both experts testified, any increase in an employer's premium after a death claim is itself an incentive. In other words, that some employers have lower incentives to improve workplace safety as a result of death-cost averaging does not equate to *no* incentive, especially in light of the high variability in death-claim amounts based on individual worker circumstances, unrelated to workplace safety.

### III. Conclusion

¶50 We hold that (1) L&I's premium-calculation method of averaging death-claim costs is consistent with recognized industrial insurance principles, in particular risk-pooling methods previously recognized and used by our legislature before it transferred industrial insurance premium-rate-setting authority to L&I; (2) L&I's "average death claim" premium-enhancement method encourages accident prevention and deters unsafe workplaces; and (3) therefore, L&I neither misinterpreted nor exceed its authority under RCW 51.16.035 when it promulgated WAC 296-17-870(3), using the "average death claim" to calculate industrial insurance premiums following a workplace injury resulting in an employee's death. Accordingly, we affirm the Board's summary judgment order upholding L&I's calculation of Di Pietro's postdeath-claim industrial insurance premium.

¶51 Whether L&I "should" adopt a different system for industrial insurance premium rate calculation is for the legislature, not the courts, to decide. We will not create legislation under the guise of interpreting a statute. *See Associated Gen. Contractors of Wash. v. King County*, 124 Wn.2d 855, 865, 881 P.2d 996 (1994); *see also Peerless*, 113 W. Va. at 10-11. Moreover, judicial restraint is especially appropriate here, where for the past 30 years the legislature appears to have left intact L&I's average-death-value-based premium calculation system as "consistent with recognized industrial [insurance] principles" under RCW 51.16.035.

¶52 Affirmed.

VAN DEREN, A.C.J., and QUINN-BRINTNALL, J., concur.

Review denied at 161 Wn.2d 1006 (2007).