IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| O.M.A. CONSTRUCTION, INC., | No. 85203-5-I |
| Appellant, | |
| | DIVISION ONE |
| v. | |
| WASHINGTON STATE DEPARTMENT OF LABOR AND INDUSTRIES, | ORDER GRANTING MOTION TO PUBLISH |
| Respondent. | |

Respondent, Washington State Department of Labor and Industries, moved for publication of the opinion filed on April 29, 2024. Respondent, O.M.A. Construction, Inc., filed an answer to the motion, stating that the respondent takes no position on the motion to publish. A panel of the court has considered the motion and has determined that the motion to publish should be granted.

Now, therefore, it is hereby

ORDERED that the motion to publish is granted.

Díaz, J.

Bruman, J.                    Mann, J.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| O.M.A. CONSTRUCTION, INC., | No. 85203-5-I |
| Appellant, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| WASHINGTON STATE DEPARTMENT OF LABOR AND INDUSTRIES, | |
| Respondent. | |

DíAz, J. — OMA Construction, Inc. (OMA) is a civil contractor which employs dump truck drivers to transport various materials to, from, and within construction sites of large public works projects. Under the Industrial Insurance Act (IIA), Washington classifies occupations or industries by their level of hazard for purposes of setting premiums for workers' compensation insurance. OMA appeals the superior court's order affirming the decision of the Board of Industrial Insurance Appeals (Board), which found that OMA (1) misclassified its business as performing excavation rather than truck driving, and (2) did so knowingly, subjecting it to significant penalties. OMA also brings a due process challenge against the Board's processes. We affirm.

I.    BACKGROUND

The following facts are undisputed: OMA is a contractor and subcontractor for, among other things, public works construction projects.  OMA's employees drive dump trucks, which carry various materials to, from and within construction or reclamation sites.  Approximately 70-75% of its employees' driving is on or within construction sites.  Its drivers may drive 100-200 miles in one day within the boundaries of a single large construction site.  For example, OMA's truck drivers hauled dirt away from the SR-99 tunnel in Seattle; hauled material within and around various highway and light rail tunnel construction sites; and hauled material to and from a reclamation site in Maple Valley.  Its truck drivers primarily stay in the cab of the truck, and do not run excavation equipment.

In June 2015, the Department of Labor and Industries (Department) audited OMA and found it had improperly classified its dump truck drivers as performing "clerical" and "landscaping" work under the rating system for Washington workers' compensation insurance.  OMA asked the Department to reconsider, and OMA's president met with Department specialists.  In various meetings, the Department instructed OMA to select the "intrastate trucking" risk classification if its dump truck drivers were driving, and to select the "excavation" risk classification *if* they were excavating.

The Department audited OMA two more times.  After the next (second) audit, OMA unilaterally adjusted the industrial insurance premium it paid because it believed it was overpaying its premium.  Specifically, OMA believed it had fewer actual losses than the Department calculated, and OMA could address the

discrepancy by selecting a different (less expensive) risk classification.

In 2020, pursuant to its third audit, the Department found OMA underreported the hours its employees worked and misclassified its business as excavation rather than truck driving, ordering OMA to pay $380,000 in additional premiums, $1.1 million in trebled penalties, and other fines, totaling approximately $1.7 million (hereinafter, Order).

OMA appealed to the Board, which affirmed the Order after several days of evidentiary hearings consisting of testimony from 14 witnesses. The Industrial Appeals Judge (IAJ) found: (1) the "Department correctly classified OMA's dump truck drivers" under the intrastate trucking classification; (2) "OMA knowingly underreported and misrepresented its hours, knowingly misclassified and misrepresented their dump truck drivers as excavation workers to the Department"; and (3) "failed to maintain and provide records for inspection as required."[1] The IAJ concluded OMA failed to prove by a preponderance of the evidence the Order was incorrect.

OMA filed a petition for judicial review in the King County Superior Court, which also affirmed the Board. OMA sought reconsideration of the court's judgment and order, which the court denied. OMA now timely appeals.

II.    ANALYSIS

A.    Overview of the IIA and Standard of Review

"The Industrial Insurance Act . . . was a 'grand compromise' that granted

---

[1] OMA does not dispute in this appeal that it knowingly underreported its hours and failed to maintain and provide records for inspection. Those facts are taken as verities. Matter of Estate of Lint, 135 Wn.2d 518, 532-33, 957 P.2d 755 (1998).

immunity to employers from civil suits initiated by their workers and provided workers with 'a swift, no-fault compensation system for injuries on the job.'" Dep't of Labor & Indus. v. Simmons, 28 Wn. App. 2d 609, 613, 537 P.3d 701 (2023) (quoting Dep't of Lab. and Indus. v. Lyons Enters., Inc., 185 Wn.2d 721, 733, 374 P.3d 1097 (2016)). "As part of this compromise, employers must maintain workers' compensation coverage through the Department." Id. (quoting RCW 51.16.060). "The Department can audit employers and issue assessments for any past-due premiums." Id. (quoting RCW 51.16.035; RCW 51.48.030).

The IIA granted the Department broad discretion to create a "rating system" for classifying occupations and industries based on their degrees of hazard and to fix corresponding industrial insurance premium rates. Di Pietro Trucking Co. v. Dep't of Labor and Indus., 135 Wn. App. 693, 704, 145 P.3d 419 (2006) (citing LAWS OF 1971, 1st Ex. Sess., ch. 289, § 16; RCW 51.16.035). The legislature delegated further authority to the Department to "adopt rules governing the method of premium calculation and . . . to encourage accident prevention and to facilitate collection." RCW 51.16.035(2). If an employer fails to pay the proper premium, the Department may "issue a notice of assessment certifying the amount due." RCW 51.48.120.

"Under the APA, a plaintiff has the burden to show that an agency acted outside statutorily-granted authority or that an agency erroneously interpreted or applied the law." Di Pietro Trucking Co., 135 Wn. App. at 700-701 (citing RCW 34.05.570). "We review the Board's conclusions of law de novo to determine whether the Board correctly applied the law and whether the Board's findings of

fact support its conclusions of law." <u>Pro-Active Home Builders, Inc. v. Dep't of Labor & Indus.</u>, 7 Wn. App. 2d 10, 16, 465 P.3d 375 (2018).

As to conclusions of law, we review interpretation of a statute de novo. <u>Di Pietro Trucking Co.</u>, 135 Wn. App. at 701. "We interpret statutes to carry out the Legislature's intent." <u>Id.</u> "If a statute is clear on its face, we derive its meaning from the language of the statute." <u>Id.</u> "'The appellate court may substitute its interpretation for that of the agency . . . [b]ut, we must 'accord substantial weight to the agency interpretation.'" <u>D.W. Close Co., Inc. v. Dep't of Labor & Indus.</u>, 143 Wn. App. 118, 129, 177 P.3d 143 (2008) (quoting <u>Everett Concrete Prods. v. Dep't of Labor & Indus.</u>, 109 Wn.2d 819, 823, 748 P.2d 1112 (1988)).

These "'[r]ules of statutory construction apply to administrative . . . regulations.'" <u>D.W. Close,</u> 143 Wn. App at 126 (quoting <u>State v. Burke</u>, 92 Wn.2d 474, 478, 598 P.2d 395 (1979)) (alteration in original). "The initial examination focuses on the plain language of the regulation. 'If an administrative rule or regulation is clear on its face, its meaning is to be derived from the plain language of the provision alone.'" <u>Id.</u> (quoting <u>Cannon v. Dep't of Licensing</u>, 147 Wn.2d 41, 56, 50 P.3d 627 (2002)). "[R]egulations are interpreted as a whole, giving effect to all the language and harmonizing all provisions." <u>Id.</u> (quoting <u>Cannon</u>, 147 Wn.2d at 57) (alteration in original). And, we have held the Department, "acting within the ambit of its administrative functions normally is best qualified to interpret its own rules, and its interpretation is entitled to considerable deference by the courts." <u>Id.</u> at 129 (quoting <u>Pacific Wire Works v. Dep't of Labor & Indus.</u>, 49 Wn. App. 229, 236, 742 P.2d 168 (1987)).

As to factual determinations, "[w]e review the Board's findings of fact for substantial evidence." Pro-Active Home Builders, 7 Wn. App. 2d at 16. "Evidence is substantial where it is sufficient to persuade a fair-minded, rational person of the finding's truth." Id. "The [Board's] conclusions of law must also flow from its findings." Henry Indus., Inc. v. Dep't of Labor & Indus., 195 Wn. App. 593, 599-600, 381 P.3d 172 (2016). "We view the evidence and reasonable inferences in the light most favorable to the prevailing party—here, the Department." Frank Coluccio Constr. Co. v. Dep't of Labor & Indus., 181 Wn. App. 25, 35, 329 P.3d 91 (2014).

"On appeal from the superior court, this court 'sit[s] in the same position as the superior court and review[s] the agency's order based on the administrative record rather than the superior court's decision.'" Henry Indus., 195 Wn. App. at 599-600 (quoting B & R Sales, Inc. v. Dep't of Labor & Indus., 186 Wn. App. 367, 374, 344 P.3d 741 (2015)) (alteration in original).

B.    Whether the Risk Classification Was Properly Assigned and Supported

    1. Further Regulatory Background on the Rating System for Classifications

Again, the Department classifies "occupations or industries by their level of hazard." WAC 296-17-31011. "Classification descriptions contained in WAC 296-17A-0101 through 296-17A-7400 establish the intended purpose or scope of each classification." WAC 296-17-31002 (emphasis added).

At its most general level, a "basic classification" is a "grouping of businesses or industries having common or similar exposure to loss without regard to the separate employments, occupations or operations which are normally associated

with the business or industry." Id. "Since a basic classification reflects the liability (*exposure to hazard*) of a given business or industry, all the operations and occupations that are common to an industry are blended together and included in the classification. The rate for a basic classification represents the average of the hazards within the classification." Id. (emphasis in original).

Specific workers' compensation classifications are enumerated in chapter 296-17A WAC. WAC 296-17-31011(1). "[T]hese rules group employers into risk classifications based on the *nature of a business* . . . each classification describes the types of businesses and operations it includes, and the classification is a blend of exposures and risks." WAC 296-17-31011(2) (emphasis added). The Department does not "classify and rate individual jobs or occupations . . . [i]nstead, each classification describes the types of business and operations it includes." Id. "Sometimes, a classification may also reference certain operations (tasks, processes, activities, etc.) excluded from the classification." Id. The Department characterizes the boundary between what is included in and what is excluded from a classification as the "scope" of the classification. Id.

With respect to the relevant classifications at issue here, the Department designates and applies several classifications related to "trucking." WAC 296-17A-1102. Relevantly, classification 1102-03 applies to "businesses that hire drivers . . . engaged in intrastate trucking." WAC 296-17A-1102-03. "Intrastate truck driving is *operating* a *vehicle hauling goods* within the boundaries of *Washington* state." Id. (emphasis added). "Duties include, but are not limited to: deadhead trips, driving without a load . . . *loading and unloading* vehicles." Id. (emphasis added).

7

Furthermore, "Types of goods hauled include, but are not limited to: . . . Bulk freight, merchandise, or commodities, . . . *gravel* or . . . *soils* . . ." Id. (emphasis added).

2. Discussion

On its face, the work of OMA's truck drivers satisfies each of the essential characteristics of the intrastate trucking risk classification: operating a vehicle, which loads, hauls, and unloads goods on Washington roads. WAC 296-17A-1102-03. The following facts are undisputed: OMA owned and operated trucks. OMA's trucks loaded and moved dirt and other excavated materials. The same trucks unloaded these materials. These actions occurred within Washington. OMA offers three initial arguments to the contrary, each of which we find unpersuasive.

First, OMA contends that the various materials its drivers transported in the trucks were not "goods," which it avers means something like tradeable commodities. As an initial matter, in this classification, "types of goods hauled [expressly] include[s]: . . . [g]ravel or aggregate . . . or soils," which OMA admits it transports. WAC 296-17A-1102-03. Even if OMA transports more than just soils, the "types of goods" may "*include but are not limited to*" an array of materials, which may have been, e.g., excavated along with the gravel, aggregate or soil. WAC 296-17A-1102-03. Nothing in the definition indicates that its scope is limited to "commodities." Id. Thus, this argument fails.

Second, OMA argues the Department should not have classified its employees as intrastate trucking drivers because they drove mostly within

construction sites rather than on "public roads." There simply is no requirement in the relevant regulations or other authority that a driver must drive on public roads to be classified in the intrastate trucking risk category. It is sufficient that OMA's driving was entirely contained within Washington, including construction sites. Thus, this argument is also unavailing.

Third, OMA argues that, because the intrastate trucking regulation enumerates equipment its dump truck drivers do not use (e.g., forklifts, hand trucks, and pallet jacks), the drivers' duties are not intrastate trucking. Similar to the argument above, the regulation specifically states "equipment *may* include, but *is not limited to*" in its preface. WAC 296-17A-1102-03 (emphasis added). Thus, the fact that OMA's drivers may not use, e.g., forklifts, is not dispositive of the question at issue: do they operate a vehicle hauling goods within the boundaries of Washington. We hold they do.

OMA next argues that, even if there is some match with intrastate trucking, the specific tasks in the excavation classification of WAC 296-17A-0101 are a *closer* match to the tasks of OMA's drivers. Specifically, OMA claims its dump truck drivers are engaged in (a) the same work (back-filling), with (b) the same equipment (dump trucks), and (c) face the same hazards (navigating the construction site) as excavators.[2]

---

[2] OMA relatedly argues our Supreme Court considered "a near identical issue" in Silverstreak, Inc. v. Dep't of Labor & Indus., 159 Wn.2d 868, 886, 154 P.3d 891 (2007), distinguishing between "mere delivery" of fill to a construction site and actual excavating. Silverstreak's analysis is inapposite because the regulations (WAC 296-127-018), the legal issue at question (whether the prevailing wage act applies), and the procedural posture (where the Department, who was entitled to "great deference," supported such a distinction) there were vastly different than

OMA's drivers, however, are not engaged in the same work as excavators because, first, the drivers simply are not digging into the earth or turning earth in any way. See, e.g., WAC 296-17A-0101-02. The "work activities in the excavation classification include (but are not limited to):

- Backfilling;
- Bringing the roadbed or project site to grade;
- Clearing or scraping land of vegetation;
- Cut and fill work;
- Earth excavation;
- Excavation or digging of earth to form the hole for pools, ponds, building foundations, and side sewer hookups (street to house) when performed as part of the excavation contract;
- Excavation of rocks and boulders;
- Grubbing;
- Piling or pushing of earth;
- Placement of plastic pool and pond liners not in connection with concrete work;
- Removal of tree stumps; and
- Slope grooming.

WAC 296-17A-0101-02. These activities inherently involve the physical removal or placement onto or into the earth of material from its original resting place, not simply the transference of the same from one location to another.

Additionally, OMA's drivers are not using equipment that could excavate or dig because, again, they are driving dump trucks, as opposed to diggers or backhoes.

And, OMA's drivers do not face the same hazards as excavators because, for the most part, they remain in the cab of their truck while on the construction site. Stated otherwise, excavators do not face road or traffic hazards when driving

here. Id. at 878 & 884. There was simply no analysis of the competing regulations as here.

to or from construction sites.[3]

Moreover, OMA bears the burden of proof to show the Department improperly applied its regulation. B & R Sales, 186 Wn. App. at 375. And, we accord the Department significant discretion when it interprets its rules and "when the subject area falls within the agency's area of expertise." Id. (quoting Dep't of Labor & Indus. v. Mitchell Bros. Truck Line, Inc., 113 Wn. App. 700, 704, 54 P.3d 711 (2002)). Here, the Department, in its expertise, examined the nature of OMA's business and classified the duties of OMA's dump truck drivers pursuant to a blend of their exposures and risks. WAC 296-17-31011(2).

In short, on the uncontested facts, OMA did not carry its burden to show the Department, as a matter of law, should have classified its dump truck drivers' risk in the excavation classification. Pro-Active Home Builders, 7 Wn. App. 2d at 16. The Department was within its discretion to classify OMA's business as it did because of the work the drivers indisputably do engage in (operating a vehicle hauling goods in Washington) and because OMA does not allege that its employees actually excavate the earth per WAC 296-17A-0101-02.

Finally, OMA argues that the Board's conclusions, nonetheless, do not follow from its findings of fact. We conclude the Department supported its application of WAC 296-17A-1102-03 with substantial evidence.

At the hearing before the Board, the Department offered an expert witness, George Mattison, who drove dump trucks for OMA. Mattison described that on a

---

[3] OMA also argues the Department classified its work solely based on OMA's public works contracts and not the hazards actually faced by its dump truck drivers, which is an assertion not supported by the record.

typical day, he drove his dump truck to the construction site, another employee loaded his truck, and he drove the load back and forth between the job site and the "dump site." As part of his duties, he only exited the dump truck to lock or unlock part if it before loading or unloading.

John Pettey, another truck driver for OMA, also testified. On direct examination by OMA, Pettey testified to spending 70 to 75 percent of his time within OMA's construction sites. He explained:

> Typically, you will be working with an excavation team . . . they'll be digging out, loading it into [the dump truck], and *you are moving it to some other area on site*. If you are hauling to another site, typically, that will be a stockpile of *dirt*, or whatever it may be that you are *taking to another site*, and dropping off . . . some of it, will be taking to a reclamation site.

(emphasis added).

When viewing this "evidence in the light most favorable to the prevailing party—here, the Department," we conclude it provides evidence "sufficient to persuade a fair-minded, rational person of the finding's truth." Frank Coluccio Constr. Co., 181 Wn. App. at 35; Henry Indus., Inc., 195 Wn. App. at 599-600.

In response, OMA argues there is (a) nothing in the findings of fact specifically regarding the hazard faced by *its* drivers, (b) no express comparison between the hazards of dump truck driving and excavation on the projects it works on besides vague allusions to "driving conditions," and (c) nothing about what percentage of risk would be acceptable under this regulation.

As to the first argument, we can imply conclusions of law from the findings of fact the Board makes because "[t]he legislature has recognized that there is an inherent hazard in all industry." Wash. State Sch. Directors Ass'n v. Dep't of Labor

& Indus., 82 Wn.2d 367, 373, 510 P.2d 818 (1973).  Here, OMA's dump truck drivers operated a truck, the truck was loaded, the driver hauled it, then the truck was unloaded.  Thus, the facts have been adduced that OMA's drivers are engaged in driving, which is an inherently dangerous activity.

As to OMA's second two arguments, OMA offers no authority in support of its argument that the fact finder must compare two possible risk classifications with each other in order to reach a reasoned decision, let alone develop percentage matrices of risk.  We do not impose such obligations here.[4]

For these reasons, we hold that the Board's conclusions "flow from its findings."  Henry Indus., Inc., 195 Wn. App. at 599-600.

C.      Knowing Misrepresentation Under RCW 51.48.020(1)(a)

   1.  Law

The Department may issue a penalty to an employer if the employer "knowingly misrepresents . . . the amount of . . . employee hours" underlying the premium it pays the Department, in which case the employer

> shall be liable to the state for up to ten times the amount of the difference in premiums paid and the amount the employer should have paid and for the reasonable expenses of auditing his or her books and collecting such sums.

RCW 51.48.020(1)(a).

   2.  Discussion

---

[4] OMA also argues that the Board's findings were insufficient because it did not expressly find that OMA hauled "goods" for the purposes of the intrastate trucking risk classification because "the findings state only that OMA hauls "dirt, debris, and other materials."  Again, we may imply conclusions of law from the findings of fact about the materials it does haul, and do so here.  Wash. State Sch. Directors Ass'n, 82 Wn.2d at 373.

13

OMA argues the Department improperly imposed its $1.7 million penalty. Specifically, OMA argues that it (a) was in a bona fide dispute with the Department about how to categorize its dump truck drivers' activities, (b) "repeatedly attempted to raise" the issue with the Department to no avail, and (c) "manually adjust[ed] its hours . . . in good faith."[5] We conclude that, as a matter of law, the Department did not err by penalizing OMA, and that the Department supported its conclusions with substantial evidence.

We interpret statutes, such as RCW 51.48.020(1)(a), to carry out the legislature's intent, and, if a statute is clear on its face, we derive the meaning from its language. Di Pietro Trucking Co., 135 Wn. App. at 701. Merriam-Webster defines "knowing" as "having or reflecting knowledge, *information*, or intelligence." MERRIAM-WEBSTER ONLINE DICTIONARY (last visited Mar. 12, 2024) (emphasis added), https://www.merriam-webster.com/dictionary/knowing. And, it defines "misrepresent" as "to give a false or misleading representation of *usually* with an intent to deceive or be unfair." MERRIAM-WEBSTER ONLINE DICTIONARY (last visited Mar. 12, 2024) (emphasis added), https://www.merriam-webster.com/dictionary/misrepresent. "When a statutory term is undefined, the court may look to a dictionary for its ordinary meaning." In re Estate of Blessing,

---

[5] OMA challenges the superior court's finding of fact that the Department's first audit of OMA showed, among other things, that OMA underreported hours, misclassified its dump truck drivers as in the landscape or clerical category, and that the Department instructed OMA to report its dump truck drivers under intrastate trucking. Although OMA challenges the superior court's *characterization and use* of the first audit, and not the audit itself, its challenge on appeal is the *result of* the third audit. Thus, because the facts are unchallenged, we treat the court's finding of fact as a verity on review. Lint, 135 Wn.2d at 532-33.

174 Wn.2d 228, 231, 273 P.3d 975 (2012).

It is undisputed and, indeed acknowledged in its own briefing, that OMA intentionally designated its dump truck drivers in a risk classification different than the one that the Department instructed OMA to use. In other words, OMA knew, or at least had information, that the Department considered the proper classification to be "intrastate trucking" and still provided what the Department would consider to be false information. Whether it "intended" to "deceive" the Department is not required under the plain language definition of the terms above. The simple fact is that it had information its hours were considered false, and took unilateral action contrary to that information.

Although no court has yet examined this provision of the statute, the Board has considered the term "knowing misrepresentation" in two separate cases, cited by the parties.[6]

First, in In Re: Eric T. Ash et Ux DBA Par Oneri Concrete, the Board concluded that a business owner "knowingly misrepresented" information it reported to the Department because the owner intentionally omitted that his father worked at the business, after the Department told him to report the father. 10 12372, 2011 WL 1903461, at *2 (Wash. Bd. of Indus. Ins. Appeals Mar. 17, 2011). The Board concluded "[m]isrepresentation can occur by omission, by failing to state what should be stated. 'Concealment or even non-disclosure may have the effect of a misrepresentation.'" Id. (citing BLACK'S LAW DICTIONARY, 7th ed. (1981)).

---

[6] We may consider BIIA decisions persuasive but not binding authority. Stone v. State, Dep't of Labor & Indus., 172 Wn. App. 256, 268, 289 P.3d 720 (2012).

"*Having previously been informed that his father was an employee*, Mr. Ash's failure to report hours and pay premiums amounts to a misrepresentation for purposes of RCW 51.48.020(1)(a)." Id. (emphasis added).

Second, in In Re: Yellow Cab Exp LLC, & in Re Yellow Broadway Transp., LLC, the Board reviewed knowing misrepresentation penalties against two different companies. 16 10201, 16 10202, 16 10203 & 16 10587, 2018 WL 3816941, at *1 (Wash. Bd. Of Indus. Ins. Appeals July 17, 2018). For its part, Yellow Cab reported *estimated* hours for its drivers because, allegedly, the Department declined to assist Yellow Cab with proper reporting. Id. at *8. The Board held "the essence of knowing misrepresentation is communication of an existing fact while *knowing that fact to be false.*" Id. (emphasis added). And, it found that Yellow Cab's estimates were not a knowing communication of false information under the statute. Id. However, the Board held that Yellow Broadway's refusal to report its employees' hours at all *did* count as a knowing misrepresentation. Id. at *10. The Board found that "communication of a false statement of fact, may be satisfied by failing to communicate a fact when there is a duty to do so." Id.

We agree with the Board's conclusion and adopt its analyses in both cases. Moreover, we hold that each further supports the Department's conclusion that OMA knowingly misrepresented the amount it was supposed to pay to the Department (a) based on its prior instructions for OMA's risk premiums (which was absent in Yellow Cab's case), and (b) regardless of any alleged failing of the

16

Department.

We so hold, first, because OMA offers no other authority that would permit it to unilaterally choose to designate the risk classifications it believed best, contrary to the Department's instructions. Stated otherwise, there is no authority, and we decline to create any, that the Department must show that an employer acted *in bad faith* to establish a claim of knowing misstatement. "'Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.'" City of Seattle v. Levesque, 12 Wn. App. 2d 687, 697, 460 P.3d 205 (2020) (quoting DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962)).

Next, as in Ash and Yellow Cab, this matter does not present an issue of mere constructive knowledge. OMA knew or should have known it was the Department's responsibility to begin by assigning a basic classification to OMA based on the nature of its business per WAC 296-17-31012. And, if OMA disagreed with the assignment after its first audit, it had the right to bring a claim under the Administrative Procedure Act, not to act unilaterally in what-can-only-be-described as "self-help." It would be certainly inconsistent with the "considerable deference" accorded to the Department to permit such measures. D.W. Close, 143 Wn. App. at 129.

Thus, we conclude, on the undisputed facts and as a matter of law, that the

Board did not err by imposing the penalty it did for knowing misrepresentation.[7]

OMA next argues that, even if the above is the correct legal standard, the Board failed to support its finding that OMA knowingly misrepresented its premium rates with substantial evidence. This argument too fails.

The Board relied upon several facts in determining OMA knowingly misrepresented its premiums. First, the Department offered several admissions from OMA's employees who drove dump trucks, who admitted their work primarily involved driving instead of excavation, and that they were told as much by the Department.[8] In other words, there is little doubt that OMA's employees "knew" the activity they were engaged in was trucking and, at a minimum, what the position of the Department was.

Second, the Department offered the testimony of the person who performed the first audit in 2013, Yussuf Abdi, who stated:

> In reviewing the records provided for audit and audit investigation, I found that nearly all of the firm's dump truck drivers were reported incorrectly in risk classification 4904-00 Clerical and 0301-08 Landscape Construction . . . The audit determined that, *almost all of the firm's construction field workers (truck drivers) performed hauling services for various public and non-public projects which precisely*

---

[7] We decline to reach the arguments from OMA and Amicus Associated General Contractors that we should construe OMA's actions as a "constructive knowledge" of the proper penalty because, again, the claim at issue here is of actual *knowing* misrepresentation, not whether OMA constructively knew.

[8] One of OMA's drivers, John Pettey, testified that on a typical day, a "trench team" dug in the ground, loaded it into the truck, and he moved it to another area of the site. And, he hauled dirt between jobsites. Additionally, Julie Sur, an account manager for the Department, testified that she told OMA's president, Barry O'Young, that if the dump truck drivers were engaged with "hauling for hire," OMA should classify their risk as that for intrastate trucking (the "1102" risk classification).

*meet the definition 1102-03 intrastate trucking risk classification . . .*

(emphasis added).  In other words, the position of the Department was long held and long communicated to OMA.

In response, OMA argues that, even if the Department had internally so concluded, its employees did not explicitly instruct OMA to classify its dump truck drivers in a classification other than excavation.  That is inconsistent with the record.  Again, Abdi testified that he explained to OMA's president

> that going forward the correct classification for his business operation should be 1102, [referring to the intrastate trucking classification] not 0101 or 0308 in the first audit.
>
>  . . .
>
> Q. Effective the first audit, did you educate the firm about those two classifications 0308 and the proper classification into 1102?
>
> A. Yes, ma'am.

Similarly, another Department auditor, Jerold Billings, testified that in a conference with OMA's president, Barry O'Young:

> Mr. O'Young admitted that he had misclassified his drivers under the landscaping classification *when they should have been reported in truck driving.*

(emphasis added).  Moreover, Billings later testified that:

> A. We exchanged emails about the reconsideration process.
>
> Q. And in those emails did you discuss to the best of your recollection the classification requirements appurtenant to landscaping and dump truck driving?
>
> A. As I recall, it was clear that we discussed that the correct classification for the drivers was driving and not landscape.

19

In short, while there may have been at times some arguable lack of clarity, there was sufficient evidence in the record to persuade a reasonable fact finder that OMA, for years, knew it was improperly categorizing its dump truck drivers because it was instructed multiple times *and admitted* that classifying its employees as anything but intrastate trucking was improper. Henry Indus., 195 Wn. App. at 600 (quoting B & R Sales, 186 Wn. App. at 375). And OMA did not carry its "burden of showing that the premiums were assessed incorrectly." Id. Thus, the Department supported its findings with substantial evidence.

D.    Due Process

To determine whether the legislative standards for an adjudicative proceeding satisfy constitutional due process requirements, we consider three factors. Hardee v. Dep't of Soc. & Health Servs., 172 Wn.2d 1, 10, 256 P.3d 339 (2011):

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

Post v. City of Tacoma, 167 Wn.2d 300, 313, 217 P.3d 1179 (2009) (quoting Mathews v. Eldridge, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976))).

OMA argues that the Department's penalties violate its due process under article 1, section 3 of the Washington Constitution. OMA did not analyze this assignment of error under the three-part Mathews v. Eldridge rubric. Instead, OMA

simply asserts that the Department violated its due process rights by "stacking" the three audits without giving OMA a chance to respond. In other words, OMA argues the Department made its risk classifications only after OMA already had reported hours for the drivers in the wrong classification, and while OMA was trying to challenge the findings of the second audit.

As a preliminary matter, nowhere does OMA offer authority that bringing successive audits per se violates a person or organization's rights. "'[N]aked castings into the constitutional seas are not sufficient to command judicial consideration and discussion.'" Pub. Hosp. Dist. No. 1 of King County v. Univ. of Washington, 182 Wn. App. 34, 49, 327 P.3d 1281 (2014) (quoting State v. Johnson, 179 Wn.2d 534, 558, 315 P.3d 1090 (2014)) (alteration in original).

Moreover, we analyze this claim, as we must, through the Mathews factors here. First, there is no dispute that the private interest that would be affected by the Department's official action is OMA's economic interest, namely the $1.7 million fine. This interest will be affected by the outcome of the proceeding. This factor compels us to proceed with caution as to a potential due process violation.

As to the second factor of the Mathews test—the degree of the risk of erroneous deprivation of OMA's interest through the procedures used and whether additional safeguards are necessary—OMA did not argue how additional procedural safeguards would have more effectively preserved its rights. It instead focuses its complaints on the timing and sequencing of the underlying investigation.

In fact, in the adjudicative process, OMA had multiple opportunities to

21

present evidence supporting its case throughout its multiple audits, and participated in multiple hearings before three layers of administrative appeals. Therefore, this factor disfavors a potential due process violation.

As to the third factor of the Matthews test, OMA does not contest that the Department has a strong interest in enforcing the Industrial Insurance Act, and its "'purpose of providing compensation to all covered employees injured in their employment, with doubts resolved in favor of the worker.'" Littlejohn Const. Co. v. Dep't of Labor & Indus., 74 Wn. App. 420, 425, 873 P.2d 583 (1994) (quoting Dennis v. Department of Labor & Indus., 109 Wn.2d 467, 470, 745 P.2d 1295 (1987)).

Weighing the factors from Mathews, we conclude that OMA does not carry its burden of showing a due process violation.

### III. CONCLUSION

We affirm the Board.

Díaz, J.

WE CONCUR:

Bowman, J.

Mann, J.